825 A.2d 1180 (2003)
361 N.J. Super. 431
STATE of New Jersey, Plaintiff-Respondent,
v.
Steven MARUT, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued April 29, 2003.
Decided June 27, 2003.
*1181 William Anklowitz, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Anklowitz, on the brief).
Daniel G. Giaquinto, Mercer County Prosecutor, attorney for respondent, submitted a letter stating that the State takes no position regarding the issue presented by this appeal.
Before Judges SKILLMAN, CUFF and WINKELSTEIN.
The opinion of the court was delivered by SKILLMAN, P.J.A.D.
Defendant appeals, by leave of court, from an order which appointed Anne C. Singer, Esq. "amicus counsel on behalf of defendant ... for purposes of investigating and presenting any arguments ... (1) relative to defendant's ability to make a knowing, intelligent, and voluntary waiver of the insanity defense, including his comprehension of the consequences of failing to assert the defense, and (2) in favor of defendant Marut pursuing an insanity defense" and directed defense counsel to assist amicus counsel in making arrangements to meet with defendant. We reverse because the court's direction to amicus counsel to assess the strength of other defenses available to defendant exceeds the scope of the inquiry required to determine competency to waive an insanity defense, an interview of defendant by amicus counsel could result in a violation of defendant's privilege against self-incrimination, and such an interview of defendant also would intrude into the attorney-client relationship between defense counsel and defendant.
On May 12, 2000, a Mercer County grand jury returned an indictment charging defendant with murdering his mother. The grand jury also charged defendant with aggravated arson and hindering apprehension.
On the date of the alleged offenses, August 10, 1999, East Windsor police officers were dispatched to the home of defendant's mother, which was engulfed in flames. After the fire was extinguished, the mother's charred remains were found in the basement. The medical examiner concluded that she was killed by a "blunt force trauma to the head," which had occurred before the fire. The next day, the police located defendant sleeping in a dumpster and arrested him. A forensic analysis of the shirt and pants defendant *1182 was wearing showed the presence of the victim's DNA. After the police administered Miranda warnings, defendant invoked his right to remain silent. Defendant also has refused to discuss the crime with the defense and court-appointed psychiatrists.
A substantial period has elapsed since the indictment during which psychiatric evaluations of defendant have been conducted to determine his competency to stand trial and his mental state at the time of the crime.
On March 28, 2001, Dr. John J. Verdon, Jr., the psychiatrist retained by the defense, provided a report which concluded that defendant suffers from "schizophrenia paranoid type" and alcohol, cocaine and cannabis dependence. Verdon also concluded that defendant "was competent to either enter a plea or proceed to trial." Regarding defendant's state of mind at the time of his mother's alleged murder, Dr. Verdon said:
Because of his psychotic condition, still present on February 21, 2001, the defendant could not cooperate fully with this psychiatrist in this evaluation.
Therefore, I am not able to render a definitive opinion regarding his mental state at the time of this crime.
However, I have no doubt that Steven Marut was floridly psychotic when these events transpired.
Further, this psychiatrist is unable to assess the degree of disruption that this psychosis caused to the defendant's rational thought process. Marut's capacity for such rational thinking was impaired but the precise manner of that disorganization could not be determined without the defendant describing his thought patterns to me.
At the time of the crime, the defendant, Steven Marut, was suffering from the delusion that he had been assaulted sexually as a young child; that his mother possessed knowledge of same, and that she failed to do anything to right the wrong. Therefore, it is highly probable that at the time of these tragic events, Steven Marut knew the nature and quality of his actions but, because of a disordered mental state, did not know that what he was doing was wrong.
Verdon's report also indicated that defendant refused to take anti-psychotic medications.
On August 16, 2002, Dr. Verdon provided a supplemental report which reaffirmed his prior conclusions regarding defendant's mental state at the time of the alleged murder, and also stated:
[I]t is likely that the defendant was cocaine intoxicated at the time of these tragic events; but I do not have the defendant's confirmation of same since he refused to discuss these matters with me. Such cocaine intoxication would compound his florid Schizophrenic Psychosis, impairing further the defendant's capacity to know the wrongfulness of his action.
However, Verdon retracted his previous opinion regarding defendant's competency to stand trial:
[U]pon further reflection, it is my current opinion that for the defendant to persistently refuse to cooperate with the expert psychiatrist, retained by his attorney to assist in the crafting of his defense, indicates that Marut's Competence to Proceed is compromised.
At the time of my February 21, 2001 examination ..., I clearly informed [defendant] that it was necessary for him to discuss these matters with me so that I could formulate an opinion regarding his culpability in these matters. Marut dismissed my entreaties, indicating that I had not established a therapeutic relationship with him; that there was no foundation for him to trust me in these *1183 personal matters. I advised your client that I was not his treating psychiatrist, that time did not permit me to conduct a series of sessions with him so that he could develop a trusting rapport with me.
You have advised me that Steven Marut still refuses to discuss these matters with this psychiatrist. Therefore, the defendant's inability to do so leaves me to conclude, with a reasonable degree of medical certainty, that Marut's Mental Competence to Proceed is significantly impaired.
The court-appointed psychiatrist, Dr. Charles F. Martinson, provided a report dated December 24, 2001, which concluded that defendant was competent to stand trial:
My efforts to conduct a complete mental status evaluation of [defendant] and to develop some impression as to his present competency were thwarted by the fact that his responses to my questions were defensive and guarded and that he refused outright to discuss a number of topics with me. For example, he refused to discuss the nature of the charges against him or the circumstances giving rise to those charges without presence of counsel and, while this was certainly reasonable from a legal perspective, it did deprive me of clinical information which might have assisted in my evaluation of [defendant]. He refused to discuss his current mental or emotional symptoms and refused to discuss any history of psychiatric treatment.
....
Mr. Marut's presentation in the medical records which I had an opportunity to review at the Workhouse would suggest that Mr. Marut suffers from a psychotic disorder. In my view, he remains guarded and paranoid.... Although the question is a difficult one, given Mr. Marut's refusal to cooperate, I saw nothing in his paranoid preoccupation which would, in itself, interfere with his ability to work with counsel or render him incompetent to stand trial on the charges against him.
Dr. Martinson did not express any opinion regarding defendant's mental state at the time of the crime.
Defense counsel filed a motion to determine whether defendant "may waive or pursue an insanity defense." At a hearing on the motion, defendant told the trial court that he did not want to pursue an insanity defense. When asked the reason for this decision, defendant said: "Because I'm not insane." Defendant also stated that he wanted a trial on the charges "[b]ecause I forsee myself a free man walking from this."
At the conclusion of this hearing, the trial court stated:
Clearly Mr. Marut appeared very lucid today and appeared to understand the information that was presented to him acknowledging he had heard it before and had discussed it with his attorneys. There are some responses, however, that suggest that a further evaluation of his mental ability to make this decision needs further development. Therefore, I'll reserve decision... whether or not Dr. Martinson should be asked for an opinion regarding the limited issue of Mr. Marut's ability under his current diagnosis to make a decision as significant as this despite Dr. Martinson's opinion in his December 2001 report, and we will also ask for more information regarding the... effects of the medication of Mr. Marut has been on since May of 2000.
At a status conference held on August 27, 2002, the court announced its tentative decision to appoint an amicus counsel to *1184 assist the court regarding defendant's capacity to waive an insanity defense:
The concern that I have regarding the competency of Mr. Marut to waive the insanity defense is that Dr. Martinson's opinion regarding that issue as well as Mr. Marut's competency to stand trial is limited to information that Mr. Marut was willing to share with him. His history of psychiatric treatment, and the facts and circumstances of the discovery regarding this case were among the issues that Mr. Marut refused to discuss with Dr. Martinson, therefore, this Court is not in the position to conclude, based upon those deficiencies, that Mr. Marut is capable of waiving the insanity defense.
Rather than ... create a conflict between [defense counsel] and Mr. Marut on this issue, there obviously being a difference in opinion and the Court not being satisfied of the defendant's competency in reaching that opinion regarding whether or not it is in his best interest to waive the insanity defense or not, it is my intention to appoint an amicus defense counsel for a limited purpose, that would be to investigate these issues, specifically the evaluations done so far, the discovery in the State's file. It would also be within the authority of the amicus defense counsel to request that this Court order any supplementary evaluations of Mr. Marut, either by Dr. Martinson or another expert, and finally, to offer an argument on behalf of Mr. Marut, which there might exist, in favor of raising the insanity defense.
....
My reasons for taking this step are the following. My review of the transcript of the hearing of March 19th, 2002 and some of the responses made by Mr. Marut including his stated reason for not wanting to raise the insanity defense, which consists of only his opinion that he foresees himself a free man, walking from this. There were no other reasons when he was asked again [what] he could offer in support of his decision to waive the insanity defense and I have some concerns about whether or not that is realistic. This Court, of course, is not privy to the State's file and should not be put in a position of having to decide what the State's chances of successfully prosecuting Mr. Marut would be.
....
It's not clear to this Court, based on the information available to me, if there are other defenses which are realistically available to the defendant, nor am I satisfied that the defendant is capable of realistically evaluating these defenses, prior to making his decision regarding waiver of the insanity defense.
So, it is the Court's theory that the attorney that would be appointed as an amicus would realistically evaluate other defenses and would act in the position of the defendant, assuming that he had a full level of competency and make arguments that he would make on his own behalf, assuming full competency.
On October 22, 2002, the court entered the previously quoted order appointing amicus counsel on behalf of defendant.
On January 7, 2003, the court sent a letter responding to several questions posed by amicus counsel concerning her responsibilities:
1. In response to your question about the presence of the prosecutor during your meeting with Mr. Marut, I advised you that it would be inappropriate for the prosecutor to be present. [Defense counsel] should be present to introduce you to Mr. Marut and explain your role in the case. However, you should have the opportunity to have a confidential conversation with Mr. Marut. [Defense *1185 counsel] may remain while you speak to Mr. Marut.
2. You inquired about the propriety of [defense counsel] sharing with you his assessment of defenses available to Mr. Marut and his case strategy. I anticipated that you would reach your own conclusions regarding the defenses available to Mr. Marut and the viability of the defenses based upon your personal review of discovery materials.
On that same day, defense counsel sent a letter to the court which stated in part:
The Court has imposed an "amicus" counsel, Anne Singer, Esquire, in this case. I am unclear what Ms. Singer needs to meet with Mr. Marut about. Ms. Singer is neither a psychiatrist nor Mr. Marut's attorney. Mr. Marut has not been determined to be incompetent to proceed. As a competent adult he is not under any sort of guardianship....
The informality suggested by the court's use of the word "meeting" ... gives rise to other concerns....
The concerns begin with Mr. Marut's fifth amendment privilege to remain silent and his sixth amendment right to counsel. He has precisely avoided discussing the merits of this case, namely the facts of what happened on August 10, 1999, with two psychiatrists, Dr. Verdon and the court appointed Dr. Martinson, and he asserted his right to remain silent and for an attorney while still in custody of the arresting municipal police department in August 1999.... As I understand the Order, Mr. Marut is not required to speak with Ms. Singer, but I am supposed to help arrange a meeting. So, if Mr. Marut does not want to speak with her he does not have to. If he does not have to speak with her, and I am his attorney, then I should be able to decline such a meeting on his behalf in protection of his fifth amendment rights. If the court agrees that this line of reasoning is correct then I assert my client's fifth amendment privilege on his behalf and hereby decline to facilitate such a meeting.
Mr. Marut is presently at the Mercer County Correction Center and, upon discussion with Ms. Singer, I believe she intends to ask him about the merits of the case. Such custodial interrogation might yield statements that could be used against him. As such, Ms. Singer would need to give him his Miranda warnings before speaking with him and, if he then chose to speak, she would need to obtain an appropriate waiver of his rights. I am concerned that with my investigator and me sitting there while this might be going on, that the relationship and trust that I have with my client would suffer permanent erosion. Frankly, I am concerned that my client will take the perspective that rather than protecting him from this sort of situation that I am helping to facilitate a potential pitfall for him.
....
Further, there may be reasons why Mr. Marut does not want an insanity defense that must be kept confidential. Even if Mr. Marut had an insanity defense, can anyone recall what percentage of insanity defenses in murder cases have been successful in Mercer County in the last decade or two decades? This exemplifies why imposition of "amicus" is so unfair. I have no way of explaining the reasons for this decision without exposing defense strategy....
If the Court is finding some difficulty in making a decision as to whether to waive the insanity defense because the psychiatric reports are unclear, then a hearing for the psychiatrists to appear should be scheduled....
With potential availability of testimony of one or both psychiatrists and the *1186 availability of a thirty day evaluation, there is no need for an amicus counsel, nor is there especially any reason such counsel needs to meet with my client and open up so many issues.
On January 9, 2003, the court entered a supplemental order, which states in pertinent part:
1. The Prosecutor shall not be present during Amicus Counsel's meeting with Steven Marut;
2. Defense Counsel should be present to introduce Amicus Counsel to Steven Marut and explain Amicus Counsel's role in the case;
3. Amicus Counsel shall have the opportunity to have a confidential conversation with Steven Marut;
4. Defense Counsel may be present, but is not required to be present, during the conversation between Amicus Counsel and Steven Marut;
5. Defense Counsel is not required to share either the assessments of defenses available to Steven Marut or assessments of defense strategy;
Defendant then filed a motion for leave to appeal from the October 22, 2002, order appointing amicus counsel and the January 9, 2003 supplemental order, which we granted.
The Code of Criminal Justice prescribes the standard for an insanity defense:
A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong.
[N.J.S.A. 2C:4-1.]
The Code also prescribes the standards for determining an accused's competency to stand trial:
a. No person who lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as such incapacity endures.
b. A person shall be considered mentally competent to stand trial on criminal charges if the proofs shall establish:
(1) That the defendant has the mental capacity to appreciate his presence in relation to time, place and things; and
(2) That his elementary mental processes are such that he comprehends:
(a) That he is in a court of justice charged with a criminal offense;
(b) That there is a judge on the bench;
(c) That there is a prosecutor present who will try to convict him of a criminal charge;
(d) That he has a lawyer who will undertake to defend him against that charge;
(e) That he will be expected to tell to the best of his mental ability the facts surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;
(f) That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge or, that if he should choose to enter into plea negotiations or to plead guilty, that he comprehend the consequences of a guilty plea and that he be able to knowingly, intelligently, and voluntarily waive those rights which are waived upon such entry of a guilty plea; and
(g) That he has the ability to participate in an adequate presentation of his defense.
[N.J.S.A. 2C:4-4.]
In addition, the Code sets forth procedures for determining an accused's competency *1187 to stand trial. N.J.S.A. 2C:4-5(a) provides:
Whenever there is reason to doubt the defendant's fitness to proceed, the court may on motion by the prosecutor, the defendant or on its own motion, appoint at least one qualified psychiatrist to examine and report upon the mental condition of the defendant.
N.J.S.A. 2C:4-5(c) provides:
If the examination cannot be conducted by reason of the unwillingness of the defendant to participate therein, the report shall so state and shall include, if possible, an opinion as to whether such unwillingness of the defense was the result of mental incompetence.
If the court receives such a report, it
may permit examination without cooperation, may appoint a different psychiatrist or licensed psychologist, or may commit the defendant for observation for a period not exceeding 30 days except on good cause shown, or exclude or limit testimony by the defense psychiatrist or licensed psychologist.
[N.J.S.A. 2C:4-5(c).]
Although we have not been provided with an order determining that defendant is competent to stand trial, the trial court apparently made this determination at some point before appointing amicus counsel.
In State v. Khan, 175 N.J.Super. 72, 417 A.2d 585 (App.Div.1980), this court considered the standards that govern a court's determination of a defendant's competency to waive an insanity defense. We endorsed the conclusion of Frendak v. United States, 408 A.2d 364, 378 (D.C.1979) "that `if a defendant has acted intelligently and voluntarily, a trial court must defer to his or her decision to waive the insanity defense[,]'" but the court "... retain[s] the discretion to raise the insanity defense sua sponte `when a defendant does not have the capacity to reject the defense.'" Id. at 81, 417 A.2d 585. Frendak also suggested procedures for determining a defendant's competency to waive an insanity defense:
... [W]henever the evidence suggests a substantial question of the defendant's sanity at the time of the crime, the trial judge must conduct an inquiry designed to assure that the defendant has been fully informed of the alternatives available, comprehends the consequences of failing to assert the defense, and freely chooses to raise or waive the defense
...
If the judge finds that the defendant is capable of making a voluntary and intelligent decision to forego an insanity defense, the judge must respect the defendant's decision.... If, on the other hand, the judge is convinced that the defendant can not or has not made such a voluntary and intelligent waiver, the judge has the discretion to raise that defense sua sponte.

[Ibid. (quoting Frendak, supra, 408 A.2d at 380-81).]
Although we found the procedures set forth in Frendak "largely persuasive," we expressed some reservations concerning the scope of the suggested hearing:
[The hearing] should not be converted into a second competency hearing, which would be the case if Frendak were followed in its entirety. Frendak speaks of a defendant's "capab[ility] of rationally deciding to reject the defense." Referring to Faretta[v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)] and [North Carolina] v. Alford[400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)] supra, in which the Supreme Court permitted defendants to waive constitutional rights only after the trial judge had assured himself that the accused was capable of making a voluntary and intelligent choice, Frendak emphasizes *1188 that the trial judge must seek the same type of assurance when a defendant chooses to reject an insanity defense. 408 A.2d at 378. But any determination that defendant did not have the mental capacity to make that choice would necessarily conflict with the criterion in N.J.S.A. 2C:4-4b(2)(f), essential to a determination of a defendant's fitness to proceed, that the defendant, as to plea negotiations or a guilty plea, "be able to knowingly, intelligently and voluntarily waive those rights which are waived upon such entry of a guilty plea." If the same kind of assurance were to be required in the case of a defendant's waiving the defense of insanity, it could not be said logically that a person found competent to stand trial may nevertheless, under the same standard, be incompetent to make a knowing, intelligent and voluntary choice to forego the defense of insanity.
... It is our view that, once defendant's competency to stand trial is established... and a further hearing is held on the matter of his waiving the defense of insanity, the inquiry into whether the choice was knowing, intelligent and voluntary should be in terms of defendant's awareness of his rights and available alternatives, his comprehension of the consequences of failing to assert the defense and the freeness of the decision to waive the defense, and should avoid an incursion into the area of mental capacity which might develop into an irreconcilable conflict with the finding of competency to stand trial.
The trial judge's task here will be an extremely difficult one. There can be no doubt that there is a fragile dividing line between defendant's competency to stand trial and, should he again be found competent in that regard, his ability to make a knowing, intelligent and voluntary waiver of the insanity defense.

[Id. at 82-83, 417 A.2d 585.]
In State v. Cecil, 260 N.J.Super. 475, 616 A.2d 1336 (App.Div.1992), certif. denied, 133 N.J. 431, 627 A.2d 1138 (1993), we reaffirmed the conclusions reached in Khan regarding a trial court's determination of a defendant's competency to waive an insanity defense. Cecil was charged with terroristic threats and other offenses based on his announcement, during a hearing in the Union County Court House, that he was carrying a bomb in a briefcase which he had "just clicked on." Cecil demanded that President Bush be brought from a local high school, where he was speaking, to the Court House. Court officers grabbed Cecil and took the briefcase, which was found not to contain any explosives. Cecil admitted what he had done but claimed he had been acting under duress. According to Cecil, two men with guns came to his house, placed what they said was a bomb in his briefcase and, threatening to harm his daughters, ordered him to take the briefcase to the Court House and instruct the judge to bring the President to the courtroom.
Believing that Cecil's account of the events leading up to the crime was delusional, defense counsel urged him to interpose an insanity defense. Cecil, however, rejected defense counsel's advice and told the court he would "not pursue an insanity defense [because] I'm not insane."
On appeal from his convictions, Cecil argued that his "defense at trial was the product of a hallucinatory or delusional psychotic episode" and that the trial court erred in "allowing him to forego the defense of insanity." Id. at 477-78, 616 A.2d 1336. We considered "[t]he critical question ... to be whether defendant's apparent certainty about the reality of his delusional or hallucinatory experience precluded such a voluntary waiver of the insanity defense." Id. at 487, 616 A.2d 1336. Applying the principles set forth in Khan, *1189 we concluded that defendant had been competent to waive an insanity defense:
He was advised by his attorney in the court's presence "that the insanity defense would stand a great chance of success." To this he responded "I understand exactly what my attorney has told me," but remained steadfast in his determination not to assert the defense. It was further stated before the court by defendant's attorney that there was no question but that defendant was competent to stand trial and that "he has the right to make a decision as to whether or not he wants to pursue the insanity defense."
Although, as in Khan, "it appears doubtful that defendant can ever be convinced that [the alleged hallucinated event did not happen] and that his belief to the contrary is the product of a disordered mind," Khan, supra, 175 N.J.Super. at 83, 417 A.2d 585, he was able to comprehend counsel's effort to help him distinguish between subjective and objective reality and determine the course to be followed in his defense. In deciding to rely on his own perceptions, rather than to accept professional counsel to the effect that those perceptions were faulty, defendant should have known that he would be fully accountable for the risks inherent in whichever choice he made. We therefore conclude that defendant was able to make a knowing, intelligent and voluntary waiver of his right to assert the defense of insanity....
[Id. at 489-90, 616 A.2d 1336.]
The Code provisions relating to the insanity defense and competency to stand trial and our decisions in Khan and Cecil interpreting those provisions contain no authorization for appointment of an amicus counsel on behalf of a defendant who seeks to waive a potential insanity defense. The idea of appointing amicus counsel appears to have been derived from Frendak, the District of Columbia Court of Appeals decision relied upon in Khan. After noting that a court may be able in some cases to satisfy itself of a defendant's competency to waive an insanity defense simply by questioning him, the Frendak court stated:
In other cases, the judge still may have doubts after such an inquiry and may desire additional information. In those situations the judge may order psychiatric examinations to determine whether the defendant's mental condition has impaired his or her ability to decide whether to raise the defense. At this point, the judge may choose to appoint amicus counsel to present evidence concerning the defendant's mental capacity.

[408 A.2d at 380 (emphasis added).]
However, Khan did not comment on this part of Frendak. Moreover, Frendak does not indicate that amicus counsel would have authority to interview the defendant, thereby creating a risk of defendant incriminating himself and intruding into the attorney-client relationship.
We conclude that there was no basis for appointing amicus counsel for the purpose of investigating defendant's capacity to waive an insanity defense and presenting arguments in favor of his assertion of this defense.[1] Initially, we note that although the order appointing Ms. Singer refers to her as "amicus counsel on behalf of defendant," the court assigned responsibilities to her which are likely to create an adversarial relationship with defendant. Defendant has clearly indicated *1190 that he does not want to pursue an insanity defense. However, amicus counsel's investigation could result in her reporting to the court that defendant is not competent to make this decision and that an insanity defense should be asserted against his wishes. Therefore, amicus counsel's actual role is not to represent defendant but rather to assist the court in deciding whether defendant is competent to waive an insanity defense and, if not, whether an insanity defense should be asserted on his behalf. Cf. Briggs v. United States, 597 A.2d 370, 374-75 (D.C.1991) ("Amicus does not act as defendant's representative, but as a friend of the court which considers amicus' presentation in deciding whether to impose an insanity defense on defendant.").
Moreover, the trial court seems to have assumed that the determination whether defendant is competent to waive an insanity defense involves consideration of whether such a waiver would be in his best interests. The order appointing amicus counsel directs her not only to investigate "defendant's ability to make a knowing, intelligent, and voluntary waiver of the insanity defense," but also to present arguments "in favor of defendant ... pursuing an insanity defense." Explaining this part of its order, the trial court's oral opinion expressed concern that defendant may not have a "realistic" understanding of the likelihood of a trial resulting in an acquittal and indicated that amicus counsel should "realistically evaluate other defenses [available to defendant]." However, as we indicated in Khan, "[i]f the judge finds that the defendant is capable of making a voluntary and intelligent decision to forego an insanity defense, the judge must respect the defendant's decision[,]" regardless of the wisdom of that decision or the likelihood defendant will be acquitted. 175 N.J.Super. at 81, 417 A.2d 585 (quoting Frendak, supra, 408 A.2d at 380-81). Thus, even though it may have been obvious to both defense counsel and the trial court in Cecil, that the duress defense which Cecil insisted upon presenting to the jury stood little chance of resulting in an acquittal, we nevertheless upheld the court's finding that "defendant was able to make a knowing, intelligent and voluntary waiver of his right to assert the defense of insanity." 260 N.J.Super. at 490, 616 A.2d 1336; see also H. Richard Uviller, Calling the Shots: The Allocation of Choice Between the Accused & Counsel in the Defense of a Criminal Case, 52 Rutgers L.Rev. 719, 753 (2000) ("[A] mentally competent, and fully advised defendant ... must be allowed to decide whether or not to defend on grounds of insanity, even if contrary to the sage advice of counsel and inimical to his interests as discerned by the court.").
Furthermore, a defendant may have reasons other than the likelihood a trial will result in an acquittal for refusing to pursue an insanity defense including "fear of lengthy institutional commitment in the event of an insanity acquittal [and] avoidance of the stigma of insanity [and] loss of consequential legal rights." Khan, supra, 175 N.J.Super. at 81, 417 A.2d 585; see also State v. Jones, 99 Wash.2d 735, 664 P.2d 1216, 1220-21 (1983); Anne C. Singer, The Imposition of the Insanity Defense on an Unwilling Defendant, 41 Ohio St. L. J., 637, 637-39 (1980). In fact, our Supreme Court has observed in dictum, citing Khan, that "there is considerable force behind the position that a competent defendant may reject the defense of insanity for any number of reasons." State v. Ramseur, 106 N.J. 123, 271 n. 62, 524 A.2d 188 (1987). Consequently, the court's direction to amicus counsel to evaluate the strength of the other defenses that would be available to defendant if he waives an insanity defense goes beyond the scope of the inquiry required to determine whether defendant is competent to make this decision.
*1191 In addition, we agree with defendant that the direction that amicus counsel be afforded "the opportunity to have a confidential conversation" with defendant could result in a violation of defendant's privilege against self-incrimination. Although defendant has thus far steadfastly refused to discuss the crime with anyone, it is possible he could make incriminating statements in the course of his conversations with amicus counsel. The attorney-client privilege would not apply to such statements, because amicus counsel is not defendant's counsel, and the privilege provided by N.J.S.A. 2C:4-5(b) and N.J.S.A. 2C:4-10 for statements to a psychiatrist or psychologist appointed to submit a report concerning a defendant's competency to stand trial would not apply because amicus counsel is not a psychiatrist or psychologist. Therefore, there is a risk that amicus counsel's purported "confidential conversation" with defendant could result in defendant making an unprivileged incriminating statements that amicus counsel could be required to disclose. See State v. Obstein, 52 N.J. 516, 525-27, 247 A.2d 5 (1968).
Moreover, defense counsel's previously quoted January 7, 2003 letter to the trial court indicates he has concluded that a meeting between amicus counsel and defendant would not be in his client's best interests. Nevertheless, the court's supplemental order of January 9, 2003, requires defense counsel to facilitate this meeting by "introduc[ing] Amicus Counsel to [defendant] and explain[ing] Amicus Counsel's role in the case." Defense counsel properly expresses concern that compliance with this directive could lead defendant to question whether defense counsel is protecting his interests, thereby undermining defense counsel's relationship with his client. Our courts have repeatedly cautioned that a trial court should not intrude into a defense attorney's relationship with the defendant. See, e.g., State v. Savage, 120 N.J. 594, 629-30, 577 A.2d 455 (1990). Therefore, the court's directive to defense counsel to facilitate a "confidential conversation" between amicus counsel and defendant constitutes an unwarranted intrusion into the sanctity of the attorney-client relationship.
We also note that the few cases that have approved appointment of amicus counsel in connection with proceedings to determine a defendant's competency to waive an insanity defense have assigned a more limited role to that counsel than the trial court assigned to Ms. Singer. For example, the court in Frendak suggested the appointment of amicus counsel "to present evidence concerning the defendant's mental capacity [to waive an insanity defense]," apparently anticipating that neither the prosecutor nor defense counsel would perform this role.[2] However, Frendak does not suggest that it would be appropriate for an amicus counsel to interview the defendant, evaluate the strengths of the State's case or the defenses other than insanity available to defendant or make any recommendation to the court concerning how it should rule upon the question of defendant's competency to waive an insanity defense. Cf. Briggs, supra, 597 A.2d 370 (noting that the court (the same court that had decided Frendak) was "not convinced that there is a special and compelling need to expand the function of amicus in cases involving mental competency beyond the function amicus serves in other areas of litigation."). *1192 Although we assume the trial court will schedule a hearing concerning defendant's competency to waive an insanity defense, it has not yet done so. Therefore, we express no opinion regarding the appropriateness of appointment of an amicus counsel with the limited role envisioned by Frendak.
Accordingly, the October 8, 2002 and January 9, 2003 orders providing for appointment of amicus counsel are reversed.
NOTES
[1] This opinion deals solely with the procedures relating to a trial court's determination of whether a defendant can make a knowing, intelligent and voluntary waiver of the right to assert an insanity defense. We do not deal with the procedures that would apply if the defendant were found incompetent to waive an insanity defense.
[2] A law review article authored by the amicus counsel appointed in this case suggests a role for amicus counsel that is somewhat broader than that provided in Frendak but more limited than what amicus counsel is required to do under the orders that are the subject of this appeal. See Singer, supra, 41 Ohio St. L.J. at 663-64.