25 A.3d 1140 (2011)
421 N.J. Super. 559
STATE of New Jersey, Plaintiff-Respondent,
v.
Robert HANDY, Defendant-Appellant.
Docket No. A-0401-09T4
Superior Court of New Jersey, Appellate Division.
Argued March 7, 2011.
Decided August 4, 2011.
*1142 Judith B. Fallon, First Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Ms. Fallon, of counsel and on the brief).
Ashlea D. Thomas, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Leslie-Ann M. Justus, Deputy Attorney General, of counsel and on the brief).
*1143 Before Judges LISA, SABATINO, and ALVAREZ.
The opinion of the court was delivered by
SABATINO, J.A.D.
This unusual case involves a defendant who, at a bench trial, was found not guilty of murder and other related offenses by reason of insanity, but who sought to have a jury trial to seek acquittal on a theory of self-defense. In rejecting defendant's motion to be tried first on his self-defense claim and instead proceeding solely with the insanity issue, the trial court was guided by our opinion in State v. Khan, 175 N.J.Super. 72, 417 A.2d 585 (App.Div.1980), which prescribes a bifurcated procedure that gives primacy to the adjudication of an insanity defense.
For the reasons stated in this opinion, we decline to adhere to the bifurcation sequence set forth in Khan. We do so because Khan conflicts with several aspects of our State's Criminal Code; Khan relied upon District of Columbia case law that is no longer valid; and Khan is contrary to the approach of other states that have addressed the question. We instead hold that a defendant who wishes to present a substantive defense based upon at least some evidence, or who otherwise wishes to put the State to its burden of proving the elements of the offense beyond a reasonable doubt, should not be required to first submit to a trial restricted to the issue of insanity. Such an insanity trial, which might result in the defendant's indefinite commitment in a mental institution, should not have to proceed first.
Because, under the flawed mandate of Khan, defendant was not afforded the opportunity to present his claims of self-defense to a jury, we remand for further proceedings to provide that opportunity, on certain terms and conditions detailed in this opinion. We also refer the many issues of procedural design and potential rulemaking implicated by this case for prospective consideration by the Supreme Court's Committee on Criminal Practice.

I.
The procedural history of this case is lengthy and complicated. Moreover, the operative facts are substantially disputed and unresolved, given the absence of a trial on the merits. With those constraints in mind, we describe what presently appears in the record, recognizing that additional relevant facts may be developed on remand.

The Fatal Stabbing and the Events That Preceded It.
This case arises out of the fatal stabbing of Arthur Cooper, defendant Robert Handy's uncle, on January 13, 2004. They lived together in a residence[1] in Paterson with defendant's grandmother, Pauline Cooper, and another relative, Mary Clay.
Defendant has long-standing mental health problems, including several hospitalizations for psychiatric illness. Four months prior to the stabbing, defendant was encountered by police officers in the Upper West Side of Manhattan, where he had walked all the way from Paterson. He was sitting on a bench, acting in what the officers perceived to be a bizarre manner. Defendant reportedly told the officers that all of his bones were broken and that he could not walk. Based on defendant's aberrant behavior, he was admitted to a psychiatric program at St. Luke's-Roosevelt *1144 Hospital Center ("St. Luke's") in New York City.
The physicians at St. Luke's determined that defendant was suffering from increased symptoms of paranoid schizophrenia. After defendant's condition stabilized, St. Luke's discharged him in early October 2003, with instructions to continue treatment and take his medication. Defendant returned to live in the family residence in Paterson.
There were no eyewitnesses to the stabbing that took place at the residence three months later on January 13, 2004. It is undisputed that defendant stabbed his uncle once, killing him. Defendant contends, however, that his uncle was high on cocaine at the time, that his uncle had attacked him with a metal pipe, and that he had used the knife only in self-defense. The State disputes that the uncle attacked defendant, contending that defendant's claim of self-defense is delusional and inconsistent with the circumstantial evidence.
Regardless of the impetus for the parties' fatal encounter, it is undisputed that several Paterson police officers came to the residence early that afternoon. Neighbors had apparently called the police because they had heard the uncle yelling for help and had seen him outside the residence bleeding. The police found the uncle lying in blood, approximately twenty-four-and-a-half feet from the front door of the dwelling, on a grassy patch off the front walkway. There was blood on the driveway, on the grass, and on the cement landing by the house. The uncle was taken to a hospital where he was pronounced dead upon arrival.
According to the testimony of Sergeant Jose Fermin, one of the officers who responded to the scene, the front door of the residence was open. The residence, as Fermin described it, had "a large amount" of blood. Blood was smeared on the front door handle and frame. Fermin noted that a couch in the first room inside was "really soiled with blood."
The police discovered a metal pipe with blood on it, partly hidden underneath the couch. The pipe, which was approximately three or four feet long, had been painted green and marked with the words "King Reveal." The uncle had the same words tattooed on his body.
Family members who thereafter arrived at the scene identified the uncle and defendant from photographs in the residence. At about 3:00 p.m., while the police were still there, defendant returned to the residence, pushing a laundry cart.
Detective Agapito Guzman, one of the other responding officers, testified that defendant "looked normal" and that defendant had no difficulty in providing his biographical information or in relating what had happened. Other family members had informed Detective Guzman of defendant's prior mental problems but, "just looking at him," Guzman observed no indication of mental instability. One of the relatives who lived with defendant later told the police that a few days before the stabbing incident, defendant had been "walking throughout the residence . . . in a threatening manner with a red-handled knife."
Detective Guzman asked defendant when he last saw his uncle. According to Guzman, defendant "told me that prior to him leaving to do his laundry [his uncle] hit him with [a] pipe. He immediately turned around and cut him, stabbed him."
At that point, Detective Guzman stopped the discussion. Defendant was informed of his Miranda[2] rights, and he was arrested. *1145 The police recovered a red folding knife from his pocket, as well as a substantial amount of cash, $5400, apparently from a Social Security check.
According to the autopsy report, the uncle died from one stab wound to the left side of his chest that penetrated his rib, lung, and heart. Cocaine was found in his blood and liver. The parties stipulated that, given the rate of metabolization, the amount of cocaine found in the uncle's body indicated "recent use."

Defendant's Statement to the Police and the Police Investigation.
Defendant was interviewed at the police station at approximately 4:00 p.m. that day. Sergeant Fermin recalled that defendant had no apparent difficulty understanding his Miranda rights, which he waived. Fermin observed nothing during the interview to corroborate the mental health issues reported by defendant's family members. While providing background information, defendant indicated that he took medication for "anxiety," but added that he had taken no medication that day.
During the course of his police interview, defendant repeatedly maintained that he had stabbed his uncle in self-defense. He gave the following statements, which were later transcribed and read aloud in court by the prosecutor and Detective Fermin:
Q. Do you know where you are at the present time and the reason you are here?
A. At the complex, because I defended myself with a weapon.

Q. In your own words, can you tell me what knowledge you have concerning this incident? . . . .
A. I don't remember the time, but I think it was sometime before the afternoon. I was awakened by Arthur, he was banging on my bedroom door. He then asked me did I go into his room and cut the fan off, which he had in his room, I told him no, that Ma, (Pauline Cooper) had cut it off. He started to yell and argue with me, so I went to the bathroom took a shower and was getting ready to go and do my laundry. The whole time I was doing this he kept yelling and fussing. While I was downstairs getting ready to leave he came downstairs like he wanted to fight me. I told him I was going to do laundry, whatever you want to do is on you. I had gone outside the house, and he came behind me. When I turned around he had a metal pipe in his hands, holding it like if it was a baseball bat. He was saying something and gritting his teeth, I kept telling him to leave me alone over and over again. Then he swung the pipe at my head and I blocked it with my left arm, which broke my wristwatch. He kept swinging at me and I kept moving behind a tree to avoid him from hitting me, then I cut him. When I cut him he backed up, it seems that he wanted to come forward but he went into the house, I gues[s]. He turned around and I left to do my laundry.
. . . .
Q. Have you ever had any problems with Arthur?
A. Yeah, well I didn't have problems he had problems with me.
Q. What types of problems did he have with you?
A. He just don't like me, when we were younger we were in the hospital in East Orange. He hit me on the face with a squeegee because I wouldn't have sex with him. That's how I got the scar on my lip. After that happened he put a shotgun to my face and threaten[ed] me so that I would *1146 not say anything about what happened, it belonged to his father who was a Vet. Then in 2000 I was at St. Joseph's hospital in the Psychiatric unit[,] he was among one of the guys who sexually assaulted me and raped me.
Q. Robert[,] you stated that Arthur followed you after you walked out of the apartment and that when you turn[ed] and saw that it was him you hid behind a tree. Where is the [t]ree that you talk about in your statement?
A. I think i[t']s in front of 118 Pearl Street, it's got a "U" in gold glued on with sparkles.
. . . .
Q. Where did he hit you?
A. He hit me once by my wrist and broke my watch band.

. . . .
Q. Did you know that what you did was wrong?
A. I felt I was defending myself. If someone comes at you with a weapon how could that be wrong.

Q. Did you understand what you were doing when you stabbed him?
A. I was defending myself.

. . . .
Q. Do you know why Arthur came after you with the pipe?
A. No[,] but he was drinking. I saw him drinking a can of Budw[e]iser when I went to take my shower. He probably was smoking crack, I smelled it.

[Emphasis added.]
Defendant described the pipe and drew a sketch of it for the officers. He told the police that, after the stabbing, he cleaned the knife in water from a puddle. Then he went to the laundromat to wash his clothes, which he claimed had no blood on them. He said that he carried a knife everywhere he went, keeping it in his pocket in case he had to defend himself. Defendant further stated that he had stabbed his uncle once before, when he thought his uncle "was going to get a gun."
Detective Fermin observed that the only damage to defendant's watch was a broken hinge that connected the band. Fermin saw no physical injuries on defendant and, specifically, none to his left wrist area.
The police located the tree near the residence that defendant had described. According to Detective Fermin, it had "a U[-shape] with glitter shiny stuff on it and some chunks of the bark that had been, looked like it had been struck by something." The missing chunks were on the ground. The tree was described by Fermin as being sixty-nine feet from the residence, although defendant contests that measurement because it was not the straightest distance to the dwelling.
As further support for the claim of self-defense, defendant's submissions indicate that the uncle had a lengthy criminal history, much of it involving drugs, including several convictions. In particular, a police report in defendant's appendix reflects that the uncle was arrested on January 6, 2004, a week before the stabbing, for selling crack cocaine. The defense contends that this history of drug involvement and criminal conduct bolsters defendant's claim that the uncle initiated the attack.[3]
On January 18, 2004, five days after he stabbed his uncle, defendant was interviewed at the Passaic County Jail by a licensed psychologist, Peter D. Paul, Ph.D. Dr. Paul diagnosed defendant as having paranoid schizophrenia. However, Dr. *1147 Paul perceived that: "[defendant's] symptoms [did] not seem to impair his ability to think rationally about his legal case"; he was competent to stand trial; and that he would not present a danger to himself or anyone else if released. Defendant remained in the jail at that point, pending the anticipated criminal proceedings arising from the stabbing.
In April 2004, a Passaic County grand jury indicted defendant and charged him with the purposeful or knowing murder of Arthur Cooper, N.J.S.A. 2C:11-3a(1) or (2) (count one); unlawful possession of a knife under circumstances not manifestly appropriate for its use, N.J.S.A. 2C:39-5d (count two); and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4d (count three). Defendant pled not guilty to these charges, rejecting the State's repeated overtures to agree to a plea of not guilty by reason of insanity.
Meanwhile, Dr. Paul recommended that defendant be transferred from jail to the Ann Klein Forensic Center ("Ann Klein"), where defendant was admitted in April 2005. Defendant was forcibly medicated while at Ann Klein and his mental status improved.

The Competency Evaluations and Proceedings.
In December 2005, Evan Feibusch, M.D., a clinical psychiatrist at Ann Klein, found defendant competent to stand trial. Dr. Feibusch recommended that defendant be returned to the jail and that he continue with his medication.
On a date that is unclear from the record supplied to us,[4] the trial court apparently found, in its initial review of the matter, that defendant had waived his right to assert an insanity defense. However, that initial finding was revisited when a different judge assumed responsibility for the case. That second judge ordered a re-evaluation of defendant's competency to stand trial and also his capacity to waive an insanity defense.
At that point, defendant was evaluated by Susan Chung, Ph.D., a clinical psychologist at Ann Klein, whom the court had ordered to evaluate defendant's competency. Defendant was also examined by Roger M. Harris, M.D., a private forensic psychiatrist retained by his counsel. Dr. Chung and Dr. Harris reached differing conclusions on the subject. The court considered their respective opinions at competency hearings held in February 2008 and October 2008.
According to Dr. Chung, defendant has suffered from paranoid delusions. The delusions included perceptions that bats were entering his ears and were about to kill him; that his bones were broken when they were not; that during his twenty-four-hour stay at a hospital he was beaten, tortured, electrocuted, and sexually assaulted by hundreds of individuals; and that, while at Ann Klein, he had a child with one of the staff members. At times, defendant believed that his attorney and a judge who had previously presided over his case were among the persons that had sexually assaulted him at the hospital.
Despite defendant's delusions, Dr. Chung concluded that he was competent to stand trial. Dr. Chung confirmed that she had considered the statutory requirements under N.J.S.A. 2C:4-4, and that defendant met all of the criteria. She noted that defendant was oriented to person, place, date, and time, and that he possessed a *1148 factual and rational understanding of the legal process and understood the different roles of the judge, the public defender, and the prosecutor. In her view, he understood the charges against him and showed "that he's able to engage in a discussion of various legal options with his attorney." In addition, Dr. Chung noted that defendant's attitude towards his attorney had improved. She further noted that defendant "[m]ost likely" would continue to be competent to stand trial, as long as he was compliant with his medications.
Defendant's own expert, Dr. Harris, disagreed. In Dr. Harris's opinion, until defendant was freed from his delusions, he would be incompetent to stand trial. According to Dr. Harris, defendant's delusions were "the most problematic" symptom for his anti-psychotic medication to address. Given the longstanding nature of those delusions, Dr. Harris concluded that the prognosis was "poor" that defendant would ever be free of them.
Dr. Harris specifically disagreed with Dr. Chung's conclusion that defendant no longer had any delusions towards his attorney. According to Dr. Harris, although defendant "very much" understood his attorney's role, and knew that the attorney was urging the defense he sought, he still linked her to "some delusional idea that [she was] present in 2000 at [the hospital] and that [she] passively participated in his being . . . assaulted and raped[.]"
Dr. Harris did acknowledge that it was "entirely possible" that defendant's claim that he had acted in self-defense was "completely truthful." In Dr. Harris's discussions with defendant, "not only did [defendant] seem to understand" the legal ramifications of his self-defense claim, but "he told a coherent story about self-defense." Dr. Harris noted that defendant understood that "self-defense means an acquittal[.]" Defendant "was shocked that he was arrested," because he "thought the defense is so strong that he wouldn't even be charged."

The Competency Ruling and The Bifurcation Ordered Pursuant to Khan.
At oral argument in the trial court in October 2008, the prosecutor argued that defendant was competent to stand trial. However, the prosecutor further asserted that "based on the findings that he really does not necessarily understand the complexities of his mental health condition, and probably never will, . . . he [was not] competent to waive a psychiatric defense."
Citing to our opinion in Khan, supra, 175 N.J.Super. at 73, 417 A.2d 585, the prosecutor argued that because issues of insanity and self-defense were both present, the insanity issues must be tried first, despite defense counsel's opposition to that sequencing. The prosecutor acknowledged that defense counsel had made a "very effective argument that it [Khan]. . . may not be the most practical sense of what the law should be[.]" Nevertheless, the prosecutor asserted that the trial court was bound to follow Khan and try the insanity issue first.
The prosecutor noted that "the fact finder could have significant difficulties when assessing the [defendant's] ability to act purposely, knowingly, or [recklessly] based upon the delusional psychiatric condition that unfortunately [defendant] has, and has had, and will have." The prosecutor argued that bifurcating the trial and adjudicating the insanity issue first, pursuant to Khan, could reduce such conceptual challenges for jurors.
Significantly, in her own oral argument to the trial court, defendant's attorney did not adopt Dr. Harris's specific opinion that her client was incompetent to stand trial, apparently because she did not anticipate her expert would render that opinion. Instead, *1149 she agreed with the State's position, as supported by Dr. Chung's testimony, that defendant was competent to proceed. Defense counsel also agreed with the State, consistent with other portions of Dr. Harris's testimony, that her client was not competent to waive a psychiatric defense.
Defense counsel then turned to the procedural question of how the insanity and self-defense issues should be adjudicated. As we have already noted, defense counsel opposed the bifurcation process prescribed by Khan, in which the insanity issue must be tried first. Instead, defense counsel moved to have the court try her client's self-defense claim first, because no second proceeding would be required if that substantive defense proved successful. She asserted that the two defenses could not be tried together because the prejudice that "spills over from the psychiatric defense to the self[-] defense [claim], is absolutely fatal to the self[-]defense case."
After considering these arguments and the experts' testimony, the trial court first concluded that defendant was competent to stand trial, so long as he continued to take his prescribed medications. The judge did not elaborate upon this point, which, as we have noted, was a position agreed to by both counsel. The judge further determined, again with the agreement of counsel, that defendant was not competent to waive an insanity defense.
Pursuant to Khan, the judge then determined that the insanity defense should be tried first in a bifurcated proceeding. The judge acknowledged that while some of the criticisms of Khan raised by defense counsel were "compelling," he was bound to follow Khan as precedential authority. In accordance with Khan, the judge ruled that a factfinder "should first hear an issue that goes to the element of a crime before any sort of affirmative defense." The judge reasoned that the issue of insanity bore directly on the mens rea element of the homicide charges. As the judge put it, "[w]ithout the requisite mens rea, the rest of the issue [of culpability] becomes moot, and the case is over."
The trial court memorialized these determinations in a written order dated October 20, 2008. The order specifically denied defendant's application to be tried first on his self-defense contentions. Defendant moved for leave to appeal that order, an application which we denied.
Thereafter, defendant waived his right to a trial by jury on the insanity issue that, pursuant to Khan, was to be tried first. The trial court determined that jury waiver to be knowing, intelligent, and voluntary.

The Insanity Trial.
The insanity issues were developed through evidence in a bench trial that consumed three days in May and June 2009. At the outset of that trial, defense counsel briefly renewed her objection to proceeding first on the insanity defense. Counsel stipulated to the admission of the findings of the medical and toxicology reports concerning defendant's uncle.
The State presented testimony from Sergeant Fermin and Detective Guzman, who described their investigation of the stabbing. None of the family members testified. The State also presented defendant's videotaped police statement, along with various items of physical evidence, including the red-handled knife, the metal pipe, and defendant's wristwatch with the broken band. The State did not present any expert witnesses.
The defense called Dr. Harris, who had previously testified at the competency hearing, as its sole witness at the insanity trial. Once again, Dr. Harris described defendant's psychiatric history and his interviews with defendant. He specifically *1150 noted defendant's prior psychiatric hospitalizations, including St. Mary's Hospital in 2000, St. Joseph's Hospital in 2002, and St. Luke's in 2003.
According to Dr. Harris, in his first attempt to interview him in March 2004, defendant was "aggressive" and "just felt like a teapot about to explode." Defendant was "irritable, threatening, extremely suspicious, and hypervigilant." When defendant was told that his trial counsel had hired Dr. Harris, defendant immediately ended the interview because, as he perceived it, the attorney had been involved in "nefarious things[.]"
Dr. Harris next interviewed defendant in June 2006, by which point he had been on antipsychotic medication for two years. This time, defendant was "more cooperative" and he told Dr. Harris about the circumstances of the stabbing event. However, defendant became agitated at times because he believed that "there are these forces that are plotting against him that aren't allowing him . . . the day in court to have justice." Defendant insisted that he had no psychiatric illness. He said that he wanted his day in court because he believed the court would immediately see that he had acted in self-defense, that the case would be dismissed, and that he could "go on his way."
Dr. Harris found it significant that defendant's delusions had not disappeared in two years of treatment. In Dr. Harris's opinion, defendant's delusions "organize[] the way that he experiences the world." The expert suggested a different psychiatric medication should be tried "because of how resistant his delusions have been[.]" Dr. Harris found that defendant would destabilize and become "floridly psychotic"[5] within a few weeks after he stopped taking medication.
In an undated writing, defendant had listed forty names in what Dr. Harris described as an attempt to "think through who he can trust." As part of that writing, defendant placed his uncle's name at the top of a list of people who he perceived had harmed him or who could not be trusted.
With specific respect to the stabbing incident, Dr. Harris acknowledged, as he had at the competency hearing, that "it is possible that [defendant] was absolutely defending himself against Mr. Cooper." Whatever happened on that date, Dr. Harris felt that defendant was "certainly" in a florid psychotic state at the time. In the expert's opinion, defendant understood the nature and quality of his actions, but he did not appreciate that what he was doing was wrong.
Dr. Harris was not questioned about the observations of the police officers that defendant appeared "normal" when they interviewed him on the day of the stabbing. Nor was Dr. Harris questioned about the impact on his diagnosis of the arguably coherent portions of the statement that defendant provided the police.
Following these proofs, defense counsel limited her summation to the insanity issues. However, she reiterated that insanity was not defendant's "preferred defense," *1151 reserving her arguments on self-defense. In response, the prosecutor agreed that the court should accept Dr. Harris's conclusions and "make a finding that Robert Handy be not guilty by reason of insanity." The prosecutor then asserted several reasons for treating defendant's self-defense claim as untenable.

The Trial Court's Insanity Ruling and the Final Judgment.
After summations, the trial judge immediately rendered his oral decision. In essence, the judge accepted Dr. Harris's testimony in its entirety and found defendant not guilty by reason of insanity.
The judge first noted that there was no dispute that the victim died as a result of a stab wound and that defendant had stabbed him. The judge also found that defendant had not been taking the medications prescribed for him by St. Luke's, and adopted Dr. Harris's opinion that he was "floridly psychotic at the time of this incident." Additionally, the judge was persuaded that defendant understood the nature and quality of his actions, but that he did not know that what he was doing was wrong.
The judge then offered some comments about defendant's self-defense claim. The judge examined the pipe and described it on the record, observing that "it would just seem to me [that] if someone were wielding that pipe in anger and hit another human being at relatively close range in the arm, arguably, as the [p]rosecutor [suggested] earlier, there might be more damage than just a broken watchband."
The judge acknowledged, however, that the self-defense issue "wasn't probed to the extent" that both counsel would have desired. The judge recognized that the record was only "complete to the extent" that the prosecutor had noted "some of what his arguments might have been had self-defense been a jury question[.]" Consequently, the judge rendered no final determination on whether defendant had established his self-defense claim.
Consistent with these rulings, on June 3, 2009, the trial court issued a final judgment of acquittal on all counts of the indictment, finding defendant not guilty by reason of insanity.
The next day, the court ordered that defendant be committed to a psychiatric facility in the custody of the Department of Human Services, pursuant to N.J.S.A. 2C:4-8b(3).[6] Defendant's commitment status was to be periodically reviewed thereafter, in accordance with State v. Krol, 68 N.J. 236, 344 A.2d 289 (1975).

The Present Appeal.[7]
This appeal followed. Defendant argues that the trial court's denial of his request to proceed first with a trial on his asserted self-defense claim deprived him of his federal and state constitutional rights to present a defense and to due process and equal protection of the laws. Defendant specifically alleges violations of the Sixth and *1152 Fourteenth Amendments of the United States Constitution, as well as Article I, paragraphs one and ten, of the New Jersey Constitution.
Defendant's central argument is that Khan was wrongly decided and is not good law. He contends that the bifurcation sequence mandated by Khan is contrary to both constitutional principles and the procedural approach of virtually all other jurisdictions that have since considered similar issues. Defendant maintains that, in spite of Khan, he should have been given the chance to present his claim of self-defense to a jury before the trial court adjudicated whether he was not guilty by reason of insanity. Defendant seeks a remand to proceed with such a plenary trial on his self-defense claims.
In response, the State contends that, despite what may be its conceptual imperfections, Khan remains the law, and that the trial court did not err in following Khan here by adjudicating the insanity issues first. The State denies that defendant's constitutional rights were transgressed in any way.
The State opposes a remand for a trial on the self-defense issues. It argues that defendant's claim that he stabbed his uncle to avoid being hit with a pipe is fanciful and inconsistent with the forensic and circumstantial evidence. In this regard, the State emphasizes that defendant exhibited no injuries to his hand where he claims to have been struck by the pipe. The State asserts that it is far-fetched to believe that defendant's watch, which did not break except for the wristband, cushioned the alleged blow.
Following oral argument, the parties supplied us, at our request, with supplemental briefs addressing the double jeopardy implications if, hypothetically, the matter were remanded to adjudicate defendant's self-defense claim.
We now examine these various issues and, in particular, the continued viability of our prior decision in Khan.[8]

II.

A.
The issue of bifurcation and the related issues before us are essentially ones of procedural structure. At one level, they implicate very practical considerations of how courts should proceed when a defendant potentially could be exonerated of criminal charges based upon a substantive justification such as self-defense, but he might also be found not guilty of the charged conduct by reason of insanity. Those considerations entail what issue or issues should be tried, in what order, and in what manner. Beyond these practical concerns, the issues implicate several fundamental aspects of our system of criminal justice and the manner in which our courts deal with individuals with mental illness.
We approach our analysis with a frank recognition that the many issues of procedural structure posed by this appeal are multi-faceted and difficult, and that perfect solutions to them may be elusive or unattainable. Such issues have perplexed judges, scholars, and policymakers elsewhere, and there is no uniform national approach to addressing them. What is readily apparent is that the bifurcation *1153 procedures developed three decades ago in Khan to address these issues are sufficiently flawed to warrant reexamination.

B.
We begin with some fundamentals. Under our system of criminal justice, the State has an important sovereign interest to deter wrongful acts and to punish appropriately the persons who commit them. The elements of those offenses are itemized, in as rational a manner as they can be expressed, in our Criminal Code. In a manner likewise designed to be coherent, rational, and fair, the Code also spells out the ranges of associated penalties for those crimes, which depend upon the particular characteristics of the offenses and of the offender.
We also have a rich constitutional tradition of assuring that persons who are charged with crimes are treated fairly. In particular, under the Sixth Amendment and other cognate provisions, defendants are guaranteed a full opportunity to defend themselves in a robust manner and, subject to rules of ethics and court procedure, to mount their defense in the way that they themselves deem most beneficial to their overall interests.
Our Criminal Code details a variety of potential justifications, excuses, and defenses, and it is typically up to the accused himself, aided by the effective assistance of counsel, to decide which, if any, of those arguments to put forth before the trier of fact. Presumably, at the conclusion of the trial process, the jury or judge will have been enlightened by the self-determined advocacy of both the prosecution and the defense, and thereby reach a verdict that is fair, impartial, and grounded rightly upon the evidence.
All of that becomes more complicated where, as here, the court is dealing with a defendant who suffers from a mental illness. At the threshold, the court must determine whether the defendant's thought processes are sufficiently afflicted that he lacks the competency to stand trial. See N.J.S.A. 2C:4-4; State v. Purnell, 394 N.J.Super. 28, 47, 925 A.2d 71 (App.Div. 2007). Inherent in that competency requirement is the defendant's capacity to confer meaningfully with his trial counsel, and to identify which theories and strategies are most likely to produce a favorable outcome for him. If the defendant is not competent to stand trial, then his criminal case does not proceed, and he typically would be thereafter confined in civil commitment until he gains or regains the competency to be tried. See N.J.S.A. 2C:4-6b.
Apart from questions of competency, a defendant's mental illness also can bear upon the elements of the charged offense itself and the defendant's potential criminal responsibility. Depending upon the offense at issue, the State must prove beyond a reasonable doubt that the defendant acted with the required mens rea, i.e., state of mind. If an accused, because of a diminished mental capacity, lacks the required state of mind, he may be acquitted on that basis. See N.J.S.A. 2C:4-2. The Code further authorizes a defendant to be found not guilty by reason of insanity, based upon his mental state at the time of the alleged criminal act. See N.J.S.A. 2C:4-1; see also State v. Rivera, 205 N.J. 472, 485-88, 16 A.3d 352 (2011) (explaining the distinctions among competency, insanity, and diminished capacity). However, if such an insanity-based verdict is rendered, the defendant might not go free. Instead, he may be committed to confinement in a facility for the criminally insane where he will be periodically evaluated to determine when, and if, his freedom might be secured. See Krol, supra, 68 N.J. at 255-66, 344 A.2d 289.
*1154 We also are cognizant of our State's administrative and judicial processes for the civil commitment of mentally ill persons who pose a danger to themselves or others. If such illnesses and dangers have been sufficiently established, a person can be civilly confined, by judicial order, in a mental health facility, even if he has not committed a crime or violated the law. See N.J.S.A. 30:4-27.1 to -27.23; R. 4:74-7f. This system is necessary for the protection of society, but it is tempered by our equally important values of civil liberties and individual autonomy. As part of those liberty interests, we recognize a mentally ill person's right, as a vulnerable member of our society, to be protected from physical harm or abuse. Within that right, we further recognize the individual's prerogative, in appropriate circumstances, to ward off physical harm through permissible acts of self-defense. Like any other human being, a mentally ill person has the right to defend himself, by reasonable means, from attacks by others. See N.J.S.A. 2C:3-4.
Having outlined these important core principles, we now focus upon the specific questions of procedural structure implicated by this appeal. A number of questions are posed. Specifically, how should the courts handle a scenario such as this one, where the accused has a potential substantive defense that, if accepted by the fact-finder, might lead to his complete acquittal of the indicted offenses, but who also could be found not guilty by reason of insanity and potentially confined in a non-penal mental health treatment facility? Should such defenses, which to some extent may overlap and conflict, be tried together, or separately? If they should be tried separately, in what sequence? Should there be two trials, or one trial in two phases? And, who determines that consolidation or sequence? The defendant alone? The parties by agreement? Or the court itself, irrespective of the parties' wishes?
We attempted to resolve these thorny issues of procedural structure, at least to some extent, in our 1980 opinion in Khan. We now examine that opinion in detail.

C.
The defendant in Khan was indicted for murder and weapons offenses. Khan, supra, 175 N.J.Super. at 75, 417 A.2d 585. He claimed that he shot the victim in self-defense after the man charged at him, brandishing a hammer. Id. at 76, 417 A.2d 585. However, there was "overwhelming psychiatric opinion evidence that [the] defendant's belief that he acted in self-defense and the facts he cite[d] in support thereof ha[d] no basis in reality and [we]re the product of a paranoid delusion." Ibid.
Psychiatric experts diagnosed Khan with paranoid schizophrenia, but, at multiple competency hearings between 1977 and 1979, they disagreed on whether he was competent to stand trial. Id. at 76-77, 417 A.2d 585. At a competency hearing held in February 1979, the trial court found the defendant competent to stand trial, and denied his attorney's application for a hearing on his insanity at the time of the offense. Id. at 75, 417 A.2d 585. The court directed the public defender to assert an insanity defense on the defendant's behalf, and appointed a special attorney to present the defendant's self-defense contentions. Ibid. The court ordered that both defenses be presented, by separate counsel, at a single trial before the same jury. Ibid.
Khan moved for leave to appeal. Ibid. Like defendant in the present case, Khan did not want his attorney to raise the insanity defense at trial because he maintained that he had acted in self-defense. See id. at 76, 417 A.2d 585. We granted *1155 Khan's motion for interlocutory review. Id. at 75, 417 A.2d 585.
On appeal, Khan's special counsel and the State argued that the court had correctly found that the defendant was competent to stand trial.[9]Ibid. All the parties agreed that, if the defendant was deemed competent to stand trial, the insanity defense could not be interposed over his objection. Ibid. Only the public defender objected to a single trial on both defenses before the same jury. Ibid.
The panel in Khan determined that a new competency hearing was necessary, in part because the defendant's delusions regarding his justification for the homicide might "be closely intertwined with his ability to consult intelligently with counsel relative to his defense[.]" Id. at 78, 417 A.2d 585. It directed that the competency hearing be conducted according to the standards of competency set forth in the newly-revised Criminal Code at N.J.S.A. 2C:4-4b. Khan, supra, 175 N.J.Super. at 79, 417 A.2d 585.
The Khan panel then considered what procedure should be employed if, hypothetically, the trial court found the defendant competent to stand trial, but he persisted in objecting to the presentation of an insanity defense. Id. at 80, 417 A.2d 585. Resolving that hypothetical question, the panel adopted what it construed as the rationale and holding of a case from the District of Columbia, Frendak v. United States, 408 A.2d 364, 379-81 (D.C.1979). In particular, Khan determined that a trial judge has the discretion to interpose, sua sponte, a defense of insanity if it has found that the defendant "is not capable of making, and has not made, an intelligent and voluntary decision" to waive the defense. Khan, supra, 175 N.J.Super. at 81, 417 A.2d 585 (quoting Frendak, supra, 408 A.2d at 379).[10]
Khan expressed concern that the simultaneous presentation of both a self-defense claim and an insanity defense at a single trial could be "fundamentally unfair" to the defendant. Khan, supra, 175 N.J.Super. at 83, 417 A.2d 585. The panel therefore concluded that "the unique circumstances" of that case warranted bifurcation. Id. at 84, 417 A.2d 585. The panel specifically instructed that the proofs on the insanity defense should be presented and tried first. Ibid. If the jury found that the defendant was not insane at the time of the crime, then, and only then, would the trial proceed on the general issue of guilt or innocence and the defendant's claim of self-defense. Ibid. The panel provided no express reasoning, however, for requiring this sequence in such "unique circumstances." See ibid.
Khan has been followed or mentioned in only a handful of our State's reported cases, none of which have questioned its underlying validity.[11] The sole opinion of *1156 our Supreme Court that has mentioned Khan, State v. Ramseur, 106 N.J. 123, 270-71 n. 62, 524 A.2d 188 (1987), cited it in a footnote for an incidental proposition that does not directly pertain to the bifurcation issues that are raised in this appeal.[12]
For numerous compelling reasons, we decline to follow the bifurcation approach set forth in Khan. First, Khan's approach cannot be readily harmonized with the criminal procedures prescribed under our Criminal Code. Second, the legal rationale for Frendak in the District of Columbia has essentially been overruled. Third, other jurisdictions addressing the subject have generally not endorsed or followed Khan's bifurcation approach. We amplify each of these reasons in the discussion that follows.

D.
The trial and appellate proceedings in Khan spanned the implementation and amendment period of the Criminal Code, L. 1978, c. 95, amended by L. 1979, c. 178, which became effective in our state on September 1, 1979, ten months before Khan was decided.[13] The new Code significantly altered the procedures to be followed when a criminal defendant appeared to be insane and, for the first time, established a comprehensive statutory standard for competency determinations. In several respects, the procedures adopted in Khan were not in sync with previous New Jersey law, nor with the procedures established by the new Code.
Our revised criminal statutes that had been in place since 1922, which were in effect when the criminal episode in Khan occurred and at the time of the competency hearings, mandated several procedures for the consideration of a defendant's competence and insanity. See Former N.J.S.A. 2A:163-2. Among other things, the fact-finder was to determine "not only the sanity of the accused at the time of the hearing, but [also] the sanity of the accused at the time the offense charged against him [was] alleged to have been committed." Ibid. If the fact-finder decided that the accused was sane at the time of the offense, but insane at the time of the hearing, the defendant was to be confined to a mental health institution. Ibid. Conversely, if the accused *1157 was deemed insane at the time of the offense, then the charges against him were to be dismissed. Ibid. If the accused was also deemed to be insane at the time of the hearing, then defendant would be confined indefinitely at the State mental hospital in Trenton. Ibid.
Notably, the insanity hearing under former N.J.S.A. 2A:163-2 was a civil, not a criminal, proceeding. See Aponte v. State, 30 N.J. 441, 455, 153 A.2d 665 (1959). The pre-Code law afforded the trial court the discretionary authority to conduct a trial of the insanity issue "in a preliminary proceeding under terms which would not prejudice the accused, i.e., a dismissal of the indictment if he is adjudged to have been insane at the time of the crime, and otherwise a right to retry the issue under the indictment." Id. at 454, 153 A.2d 665.
The procedures under former N.J.S.A. 2A:163-2 "were not intended to permit an accused to by-pass the criminal trial if he is able to defend, or to entitle him to a trial run of his defense of insanity by the expedient of asserting incapacity to defend." Id. at 455, 153 A.2d 665. Instead, the purpose of the procedures "was to permit a termination of the criminal proceeding if the accused is unfit for trial." Ibid. If a defendant's incapacity was found under the terms of former Title 2A, the court had the discretion to conduct a further inquiry, alone or with a jury, into the defense of insanity. Aponte, supra, 30 N.J. at 455, 153 A.2d 665. The former statute did not require that the insanity defense be tried at the time of the inquiry into the defendant's ability to stand trial, or that the defense be tried at all. Ibid.
The ensuing adoption of Title 2C and the comprehensive Criminal Code eliminated the two-part civil inquiry of former N.J.S.A. 2A:163-2. In its place, the Code provided in N.J.S.A. 2C:4-6f that "[t]he fact that the defendant is unfit to proceed does not preclude determination of any legal objection to the prosecution which is susceptible of fair determination prior to trial and without the personal participation of the defendant." (Emphasis added). The commentators to the Code explained that this provision was designed to allow for the pre-trial determination of certain issues, including insanity, when the defendant was found unfit to proceed. 2 Final Report of the New Jersey Criminal Law Revision Commission, comment 6 on N.J.S.A. 2C:4-6 (1979). It was intended to address concerns stemming from the ongoing "confinement of a defendant without an adjudication of guilt at a criminal trial." Ibid.
The procedure in Khan, isolating the determination of a defendant's sanity at the time of the crime from both the determination of his guilt, and the determination of other defenses, was therefore rooted in some respects in the separation of those issues under former N.J.S.A. 2A:163-2. However, Khan significantly departed from the civil proceedings called for under the former statute. See Khan, supra, 175 N.J.Super. at 84, 417 A.2d 585. Khan prescribed that the determination of insanity in a criminal proceeding, which could otherwise terminate in a judgment of acquittal, should occur prior to the determination of a defendant's actual guilt or innocence. Ibid. Neither N.J.S.A. 2A:163-3, nor the Code provision that replaced it, specifically authorized a defendant's insanity to be tried and determined in such a separate criminal proceeding.
Apart from that troublesome departure, the procedures in Khan also are at odds with the legal classification within Title 2C of insanity as an affirmative defense. See N.J.S.A. 2C:4-1. The 1979 Criminal Code codified the standards *1158 of the M'Naghten[14] test for insanity, which New Jersey had embraced since 1846. See State v. Winder, 200 N.J. 231, 242-43, 979 A.2d 312 (2009); State v. Spencer, 21 N.J.L. 196, 201, 204-05 (Sup. Ct.1846). In particular, the Code provides:
A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong. Insanity is an affirmative defense which must be proved by a preponderance of the evidence.
[N.J.S.A. 2C:4-1.]
The burden to prove insanity is on the defendant. State v. Jimenez, 188 N.J. 390, 406, 908 A.2d 181 (2006). A successful insanity defense exculpates an accused from guilt for conduct that otherwise would be criminal. State v. Delibero, 149 N.J. 90, 99, 692 A.2d 981 (1997).
The advancement of a claim of insanity under the Code does not relieve the State of its burden of proof. Jimenez, supra, 188 N.J. at 406, 908 A.2d 181; Delibero, supra, 149 N.J. at 99-100, 692 A.2d 981. To the contrary, the State remains "constitutionally responsible to prove every element of the offense beyond a reasonable doubt." Delibero, supra, 149 N.J. at 100, 692 A.2d 981. However, juries must consider evidence of a defendant's insanity with respect to his ability to form the requisite mental state, which, as an element of the crime, must be proven beyond a reasonable doubt. Id. at 106, 692 A.2d 981.
The procedures developed in Khan depart materially from these basic tenets. Rather than require the State to prove the elements of an offense in a criminal proceeding, Khan essentially presumes that the State has already done so. See Khan, supra, 175 N.J.Super. at 84, 417 A.2d 585. Under Khan, only if the fact-finder adjudges the defendant sane at the time of the crime does the matter proceed to a determination of "the general issue of defendant's guilt or innocence of the crimes charged[.]" Ibid.
Under the common-law test that was in effect at the time the competency hearings in Khan were conducted, between July 1977 and February 1979, an individual was competent to stand trial if he was able to "comprehend his position, to consult intelligently with counsel and plan his defense[.]" Id. at 82, 417 A.2d 585 (quoting State v. Auld, 2 N.J. 426, 435, 67 A.2d 175 (1949)); see also State v. Sinclair, 49 N.J. 525, 549, 231 A.2d 565 (1967). The new Criminal Code that became effective in 1979 established a far more comprehensive test for competency:
A person shall be considered mentally competent to stand trial on criminal charges if the proofs shall establish:
(1) That the defendant has the mental capacity to appreciate his presence in relation to time, place and things; and
(2) That his elementary mental processes are such that he comprehends:
(a) That he is in a court of justice charged with a criminal offense;
(b) That there is a judge on the bench;
(c) That there is a prosecutor present who will try to convict him of a criminal charge;
(d) That he has a lawyer who will undertake to defend him against that charge;

*1159 (e) That he will be expected to tell to the best of his mental ability the facts surrounding him at the time and place where the alleged violation was committed if he chooses to testify and understands the right not to testify;
(f) That there is or may be a jury present to pass upon evidence adduced as to guilt or innocence of such charge or, that if he should choose to enter into plea negotiations or to plead guilty, that he comprehend the consequences of a guilty plea and that he be able to knowingly, intelligently, and voluntarily waive those rights which are waived upon such entry of a guilty plea; and
(g) That he has the ability to participate in an adequate presentation of his defense.

[N.J.S.A. 2C:4-4b(2) (emphasis added).]
The panel in Khan was rightly concerned that a procedure that allowed for a finding that a defendant was competent to stand trial, but incompetent to waive the insanity defense, might yield a result inconsistent with N.J.S.A. 2C:4-4b(2)(f). That provision requires that the competency determination be based in part on a finding that the defendant was able to knowingly, intelligently, and voluntarily waive his rights in a plea bargain. Khan, supra, 175 N.J.Super. at 82, 417 A.2d 585. The panel in Khan acknowledged that:
If the same kind of assurance were to be required in the case of a defendant's waiving the defense of insanity, it could not be said logically that a person found competent to stand trial may nevertheless, under the same standard, be incompetent to make a knowing, intelligent and voluntary choice to forego the defense of insanity.
[Ibid.]
Khan attempted to remedy this potential inconsistency by directing that the inquiry into the waiver of the insanity defense "should avoid an incursion into the area of mental capacity which might develop into an irreconcilable conflict with the finding of competency to stand trial." Id. at 82-83, 417 A.2d 585. Instead, "the inquiry into whether the choice [to waive the defense of insanity] was knowing, intelligent and voluntary should be in terms of defendant's awareness of his rights and available alternatives, his comprehension of the consequences of failing to assert the defense and the freeness of the decision to waive the defense[.]" Id. at 82, 417 A.2d 585.
In fashioning these procedures, the panel in Khan was largely persuaded by aspects of the District of Columbia Court in Frendak. Khan, supra, 175 N.J.Super. at 80-82, 417 A.2d 585 (citing Frendak, supra, 408 A.2d at 373-79). In particular, Khan adopted Frendak's rationale that a competency finding was not intended to measure a defendant's ability to make intelligent decisions on matters related to his defense. Khan, supra, 175 N.J.Super. at 81, 417 A.2d 585.
Khan and Frendak both cited Whalem v. United States, 346 F.2d 812 (D.C.Cir.), cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965), as part of their analysis. The issue in Whalem was "whether or not a competent defendant may refuse to plead insanity even though there may be facts available to support that defense; and if so, whether the trial judge commits error by not raising the issue of insanity sua sponte and instructing the jury." Whalem, supra, 346 F.2d at 818. The United States Court of Appeals for the District of Columbia held in Whalem that a trial judge "must have the discretion to impose an unwanted defense on a defendant and the consequent additional burden of proof on the Government prosecutor." Id. at 819.
*1160 Subsequently, the United States Supreme Court issued two opinions that emphasized defendants' "right to make decisions central to their defense." Frendak, supra, 408 A.2d at 375. The first, North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), held that it was not unconstitutional for a trial judge to accept a guilty plea from a defendant who proclaimed his innocence. The second, Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), guaranteed a defendant's right to represent himself and prohibited a state from compelling a defendant to accept representation by an attorney. Those Supreme Court cases reasoned that a defendant must be permitted to make choices central to his own defense, even if they might prove to be detrimental.
In 1991, twenty-six years after Whalem was decided, the United States Court of Appeals for the District of Columbia repudiated Whalem in United States v. Marble, 940 F.2d 1543, 1545 (D.C.Cir.1991). As the court noted in Marble, "[n]o other federal court of appeals has imposed a duty upon the district court to raise the insanity defense; indeed, only a few have even considered the issue." Ibid. The court further noted in Marble that the imposition of an insanity defense, over the objection of a defendant who was competent to stand trial, raised "troubling questions" for several reasons. Ibid.
First, Marble observed that the Whalem line of cases was in "substantial tension" with the propositions expressed by the United States Supreme Court in Alford and Faretta, holding that the court may defer to a defendant's strategic decision to accept criminal responsibility even where the defendant's "actual culpability is neither proven nor admitted." Marble, supra, 940 F.2d at 1546. Second, to compel a defendant to assert a particular defense that forces him to affirm that he is insane renders both counsel and the defendant, in effect, organs of the State. Ibid.
In keeping with the Supreme Court's decisions in Alford and Faretta, the Court of Appeals in Marble overruled Whalem. Marble held that "a district court must allow a competent defendant to accept responsibility for a crime committed when he may have been suffering from a mental disease." Marble, supra, 940 F.2d at 1546. The trial court "must honor the choice of a competent defendant not to raise the insanity defense." Id. at 1548. It is only "[w]hen a defendant can make no clear choice for or against raising the defense, and the evidence suggests that the defense is viable, it might then be appropriate for the court to exercise its discretion to instruct the jury sua sponte." Ibid.
With respect to the critical issue presented here of bifurcation, Khan endorsed a trial sequence that was actually contrary to the then-existing procedures utilized in the District of Columbia and noted in Frendak. The District of Columbia did permit a bifurcated proceeding when a defendant raised an insanity defense. Frendak, supra, 408 A.2d at 369 n. 4. But the issue of insanity was not to be considered by the trier of fact in the District of Columbia until the prosecution had established the elements of the offense beyond a reasonable doubt. Ibid. Only when a jury had already found a defendant guilty of the charged offense could it then consider the insanity defense. Id. at 377; see also Bethea v. United States, 365 A.2d 64, 94 n. 67 (D.C.1976), cert. denied, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977).[15]
*1161 Hence, Khan departed from the procedures of the District of Columbia by directing that issues of insanity and self-defense be bifurcated at trial, with the insanity issue tried first. Khan, supra, 175 N.J.Super. at 84, 417 A.2d 585. Under the Khan approach, only if the defendant is found not to have been insane at the time of the crime does the trial then proceed on the general issue of innocence or guilt, where defendant might raise substantive defenses, such as self-defense. Ibid.
In sum, Khan's reliance upon Frendak and Whalem is now misplaced, in light of current federal law. Moreover, the bifurcation sequence adopted in Khan is contrary to the sequence that had been provided for in the District of Columbia when Frendak was decided.

E.
Defendant further argues that the sequencing called for under Khan is inconsistent with the law of most other states that have addressed the scenario. Defendant is correct in this observation, and the State has not shown otherwise.
For example, in California, "[w]hen a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, the defendant shall first be tried as if only such other plea or pleas has been entered[.]" See Cal.Penal Code § 1026(a) (Deering 2011) (emphasis added). At that initial trial, "the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed." Ibid. If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, "then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court." Ibid.
Other states provide a defendant with the statutory right to a bifurcated trial when he pleads not guilty by reason of insanity and also asserts other defenses.[16] In those states allowing such bifurcation, the dominant approach is to have the substantive defenses tried first, and, if necessary, the insanity defense tried thereafter. See generally Debra T. Landis, Annotation, Necessity or Propriety of Bifurcated Criminal Trial on Issue of Insanity Defense, 1 A.L.R. 4th 884 (1980 & Supp.2010);[17]see also Verla Seetin Neslund, Comment, The Bifurcated Trial: Is It *1162 Used More Than It Is Useful?, 31 Emory L.J. 441 (1982).
Some state legislatures have provided for a procedure allowing a criminal defendant to make an election as to the sequencing of his defenses.[18] Other states leave the issue of bifurcation to the sound discretion of the trial judge.[19] A pivotal consideration in several of those states is whether "the accused has a substantial defense on the merits which may be prejudiced by the admission of evidence as to the insanity defense."[20] Landis, supra, 1 A.L.R.4th 884 at § 2[a]. However, not all states follow that approach. Id. at § 4; see also Neslund, supra, 31 Emory L.J. at 486-87.[21] Moreover, some states have held that mandating bifurcation of these issues is unconstitutional.[22]
Despite these wide variations in practice among the states, one thing is clear. The bifurcated sequence called for under Khan, mandating that the insanity issues be tried first, is an outlier. The vast majority of states that have considered the issue have not adopted a similar approach. In fact, neither of the parties have identified in their briefs another jurisdiction that follows the Khan bifurcation sequence. That only increases our reluctance to reaffirm Khan's holding.

*1163 F.
These abundant reasons persuade us to depart from the bifurcated sequence set forth in Khan. We do not agree with Khan that an interposed insanity defense must be tried first before the State has met its evidential burden of establishing guilt beyond a reasonable doubt or before a defendant has received an opportunity to seek an acquittal on the merits. Khan also prescribes a sequence that is opposite to that followed by most other states allowing bifurcation. In fact, the trial judge in this very case expressed in his bench comments some reluctance to apply Khan. For these reasons, we decline to follow Khan in this case.
That said, we face considerable constraints, particularly as an intermediate appellate court deciding an appeal involving only two lawyers[23] and a rather idiosyncratic procedural history, in designing an optimal procedure that prospectively should take Khan's place. For many reasons, the design issues are troublesome.
The simultaneous pendency of a self-defense claim and an insanity defense in a homicide trial places both sides in an awkward position. The proofs necessarily must delve, at least to some degree, into the defendant's state of mind at the time of the killing. In endeavoring to secure a conviction in this case, for example, the prosecution will want to show that defendant had no justification to use deadly force, and that his perceived need to defend himself from an attack was irrational. However, if the State presses that argument of irrational perception too far, it runs the risk that doing so will help validate defendant's insanity defense. On the other hand, defendant must be careful in advancing his self-defense theory of portraying himself too much as a rational actor, for if the self-defense theory fails, his assertion that he knew what he was doing in deploying deadly force will undermine his separate contention of insanity.
When a mental health expert who has evaluated a defendant testifies, trial counsel for both sides can have ambivalence about the opinions that the expert renders. If the expert states that the defendant was delusional, that could help defeat the self-defense claim, but also could bolster an insanity defense. Similarly, an expert who opines that the defendant is and was perfectly sane may help the State on the insanity issue, but also might fortify the defendant's contention that he justifiably perceived the need to ward off an attacker.
These strategic problems may be heightened at a so-called "unitary" trial, at which the fact-finder receives proofs on all of the issues, including the insanity defense, and renders a comprehensive verdict. The problems arguably might be abated, to some degree, by sequencing the proofs in a two-phased trial before the same jury, in which the insanity issue is reserved for a second, conditional phase only if the self-defense claim fails in the first phase and the defendant is found guilty.[24] Such phasing can be time-consuming and does *1164 not eliminate the problems of evidential overlap and inconsistency of advocacy. Jurors may have difficulty appreciating how a defendant can legitimately argue in the first part of the trial that he acted rationally to defend himself and then take a seemingly opposite stance in the second phase by asserting his insanity. The jury might have similar concerns about what may appear to be a "role reversal" by the State. Moreover, favorable evidence adduced by one side on state-of-mind issues in the first phase might be used to impeach that same party's different contentions in the second phase.
These difficulties of inconsistency and overlap conceivably might be tempered if the case is structured as two separate trials before two separate fact-finders, with the insanity trial occurring second, and only if necessary. That arrangement is even more inefficient and time-consuming. It also does not eliminate the potential for evidence from the first trial being used to undercut the position of the party who had previously adduced it. There is also the prospect of inconsistent fact-finding, for example, if the first jury concludes that the defendant was delusional and that his use of force was therefore unreasonable, and the second jury concludes, to the contrary, that the defendant's behavior was not delusional and that he was not excused from his acts by reason of insanity.
No optimal solution is apparent that will eradicate these difficulties. We commend these prospective issues to the Supreme Court's Criminal Practice Committee for fuller consideration and potential rule-drafting, by a wider segment of practitioners, scholars, experts, and judges.[25] We need only express here our view that Khan should no longer be followed. Specifically, we hold that it is improper to force a defendant to submit to an initial trial solely on insanity and thereby deprive him of the opportunity to have substantive defenses tried that potentially could lead to his outright acquittal rather than his commitment.

III.

A.
Having explained why we believe Khan is not sound law, we now turn to the implications of our ruling with respect to defendant's own particular circumstances. We begin by considering, in more depth, his desire to assert a theory of self-defense.
The parameters of the use of force to defend oneself are set forth in the Code at N.J.S.A. 2C:3-1 to -4. In general, "the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." N.J.S.A. 2C:3-4a. However, the statute also proscribes the use of deadly force in self-defense under certain circumstances, providing that:
The use of deadly force is not justifiable under this section unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm; nor is it justifiable if:
(a) The actor, with the purpose of causing death or serious bodily harm, *1165 provoked the use of force against himself in the same encounter; or
(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take, except that:
(i) The actor is not obliged to retreat from his dwelling, unless he was the initial aggressor[.]
[N.J.S.A. 2C:3-4b(2).]
In addition, defendant's belief that he needed to resort to deadly force against his uncle must be shown to have been objectively reasonable and sincere. See State v. Rodriguez, 195 N.J. 165, 173, 949 A.2d 197 (2008). A defendant's sincere, but delusional, belief in the need to use deadly force would be insufficient to sustain a claim of self-defense. See State v. Kelly, 97 N.J. 178, 199-200, 478 A.2d 364 (1984).
We recognize that defendant's statement to the police that he encountered his uncle outside their residence, and the proofs suggesting that robbery may have been the motive for his uncle's attack, undermine his contention that he justifiably acted in self-defense. The use of deadly force is not justifiable when an actor knows he can avoid it with complete safety by retreating or by surrendering demanded property. N.J.S.A. 2C:3-4b(2)(b). The Code does not provide a victim with "a license to kill a robber, even when the victim knows he can safely retreat without resort to deadly force." Rodriguez, supra, 195 N.J. at 175, 949 A.2d 197. The law does not assume that the victims in all robberies will reasonably believe that they are "likely to suffer death or serious bodily injury and cannot safely retreat." Ibid.
The factual record in this case was not sufficiently developed to apply these legal standards. There are a variety of unresolved factual issues, including: (1) where the altercation actually began and ended, (2) whether defendant reasonably believed that stabbing his uncle was necessary to protect himself from death or serious bodily harm, and (3) whether defendant knew he could have avoided the use of deadly force by retreating or by surrendering his property. These are all viable issues that should be determined at a trial. See id. at 174-75, 949 A.2d 197.
A trial court is obliged to instruct a jury on self-defense as long as the charge is requested and there is "some evidence" in the record to support it. Id. at 174, 949 A.2d 197; see also RPC 3.1 (prohibiting attorneys from knowingly presenting non-meritorious affirmative contentions, but nevertheless allowing criminal defense counsel to "so defend the proceeding as to require that every element of the case be established"). The factual issues reasonably bearing on defendant's claim of self-defense, and the possibility of his exoneration, were left unresolved when the trial court bifurcated the case pursuant to Khan and decided the insanity issue first.
"The Federal and New Jersey Constitutions guarantee criminal defendants a meaningful opportunity to present a complete defense.'" State v. Garron, 177 N.J. 147, 168, 827 A.2d 243 (2003) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636, 645 (1986)), cert. denied, 540 U.S. 1160, 124 S.Ct. 1169, 157 L.Ed.2d 1204 (2004). Defendant here was not afforded this guaranteed opportunity to present a defense that might have resulted in his acquittal.
The State argues that defendant's claimsthat his uncle swung the pipe at *1166 him, that he warded off the attack with his arm, and that the pipe struck his wrist watchare patently incredible. The State emphasizes that the watch was not shattered and that no marks from the pipe were apparently left on defendant's arm. The State also raises doubts about defendant's claim that his altercation with his uncle occurred by the tree, since no blood was found on or near the tree, and the tree is a substantial distance from where the uncle's body was discovered.
Although we understand, as did the trial judge, the State's reasons for being skeptical of defendant's account, we cannot say that his account is so patently without evidential support that it should not be presented, in a plenary fashion, to a trier of fact. The failure of the watch to shatter, as well as the absence of physical marks on defendant's arm and blood stains on the tree, do not necessarily preclude the possibility that defendant was attacked in some manner by his uncle and that he was attempting to defend himself. The substantial cash in defendant's possession, the uncle's motive to attempt to rob him of that cash, and the discovery of the pipe bearing the uncle's tattooed nickname provide sufficient counter-proof that could be reasonably consistent with a self-defense theory.
The self-defense claim in this case cannot be precluded out of hand, despite its potential weaknesses. Those weaknesses can, of course, be explored by the State at a trial, both through the cross-examination of defense witnesses and the presentation of the State's own proofs.
We also note that the bifurcation sequence employed here impinged upon the presumption of innocence to which defendant was entitled. It effectively relieved the State of its responsibility to prove the elements of the crime beyond a reasonable doubt. See State v. Wakefield, 190 N.J. 397, 576-77, 921 A.2d 954 (2007), cert. denied, 552 U.S. 1146, 128 S.Ct. 1074, 169 L.Ed.2d 817 (2008). To obtain a conviction for purposeful or knowing murder, the State was required to prove that defendant's "conscious object" was to cause death or serious bodily injury resulting in death. See State v. Jenkins, 178 N.J. 347, 362, 840 A.2d 242 (2004).
The State presented little, if any, evidence at the insanity trial that defendant attacked his uncle with the conscious object to kill him, or to cause serious bodily injury. This was not a case where the victim sustained multiple stab wounds that might circumstantially indicate a defendant's intention to cause suffering and harm. Cf. State v. Hunt, 115 N.J. 330, 389, 558 A.2d 1259 (1989). To the contrary, the victim here died from a single stab wound, consistent with defendant's claim to have ceased his own assault once he thwarted his uncle's attack. Defendant's writings, identifying his uncle as one of several persons that he did not trust or like, do not necessarily prove that he intended on this occasion to use deadly force against the uncle without justification.
For these reasons, defendant was manifestly prejudiced by the trial court's failure (albeit one mandated by Khan) to allow him to present, in a plenary fashion, evidence that he acted in justifiable response to an attack by his uncle. An acquittal by reason of insanity terminates the criminal proceedings against a defendant, but nevertheless subjects an individual to a deprivation of liberty in the form of commitment. N.J.S.A. 2C:4-7 to -8; see State v. W.K., 159 N.J. 1, 4, 731 A.2d 482 (1999). On the other hand, a successful defense of justification will exonerate a defendant from criminal liability with no loss of liberty. State v. Jenewicz, 193 N.J. 440, 450, 940 A.2d 269 (2008); State v. *1167 Kelly, 97 N.J. 178, 197-98, 478 A.2d 364 (1984).
As a criminal defendant who has been committed after an adjudication of not guilty by reason of insanity, defendant's continued commitment is subject to a lesser standard of proof than that of persons who are civilly committed. The burden of proof for continued commitment of a criminal defendant found not guilty by reason of insanity is a preponderance of the evidence. N.J.S.A. 2C:4-8b(3). By contrast, persons who are civilly committed are subject to continued commitment only upon a showing of clear and convincing evidence. See N.J.S.A. 30:4-27.15; In re Commitment of Edward S., 118 N.J. 118, 130-31, 570 A.2d 917 (1990).
Persons acquitted by reason of insanity and civilly committed individuals are all subject to periodic hearings to consider whether their continued involuntary commitment is warranted based on dangers they may pose to themselves or others. N.J.S.A. 2C:4-8b(3); see also N.J.S.A. 30:4-27.16; In re Commitment of J.R., 390 N.J.Super. 523, 529-33, 916 A.2d 463 (App.Div.2007). In addition, the future consideration of the continued commitment of a defendant who is the subject of an insanity disposition by a criminal judge must "give substantial weight to the nature and seriousness of the crime committed by defendant and its relationship to his present mental condition." Krol, supra, 68 N.J. at 261, 344 A.2d 289. As we have already shown, the "nature and seriousness" of defendant's crime was not fairly adjudicated here, because evidence that he acted in self-defense was precluded under the bifurcated procedure called for under Khan.
Even if the State proves the elements of its case and defendant's conduct proves insufficient to acquit him on the basis of self-defense, the self-defense proofs would at least be relevant to the "nature and seriousness" of his crime, and germane to the consideration of his dangerousness for purposes of his continued confinement at future Krol hearings. Defendant should have been given a chance to develop those mitigating proofs at a plenary trial. Further, the proofs might have led a jury to find him guilty of a lesser-included homicide, such as manslaughter, see N.J.S.A. 2C:11-4, which could also bear on the Krol analysis.
We reject the State's argument that defendant received the functional equivalent of a trial on self-defense during the insanity proceedings. Although he made some incidental comments about defendant's self-defense theory, the trial judge himself explicitly recognized that the parties had not been afforded a full opportunity to present, or to refute, evidence bearing upon his self-defense theory. Moreover, the court made no ultimate findings about the merits of the self-defense claim.
For these reasons, we conclude that defendant was unfairly precluded from having a fact-finder fully consider a defense that could have resulted in his acquittal. In reaching that conclusion, we do not fault the trial judge for applying the bifurcation sequence presented by Khan, which he was bound to follow as precedent. Nevertheless, the process utilized here was erroneous and prejudicial.

B.
We finally consider the question of how to remedy the trial court's deprivation of defendant's right to present his self-defense claims in a plenary manner to a fact-finder. Defendant requests the remedy of remanding the case for a trial on the self-defense issue, and, if he prevails at such a trial, an order for judgment of acquittal and his release from institutional commitment.
*1168 Defendant's prayer for relief is flawed, in that he seeks the proverbial objective of "having one's cake and eating it too." He seeks to retain the benefits of his present insanity-based disposition, essentially as a back-up means of avoiding prison. He argues that, under double jeopardy principles, the State and this court cannot divest him of his acquittal predicated on insanity grounds.
In its post-argument letter briefs, the State concurs that double jeopardy principles do not allow defendant's present disposition to be taken away from him involuntarily. Even so, the State disputes defendant's claimed entitlement to a remand and to a plenary trial on the merits, including his self-defense contentions.
The Double Jeopardy Clause of the United States Constitution guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S.Const. amend. V. Its prohibition is extended to the states through the Fourteenth Amendment. See Benton v. Maryland, 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707, 716 (1969); State v. Widmaier, 157 N.J. 475, 490, 724 A.2d 241 (1999). The New Jersey Constitution also guards against double jeopardy, in its provision that "[n]o person shall, after acquittal, be tried for the same offense." N.J. Const, art. I, ¶ 11.
Double jeopardy principles disallow repeated attempts to obtain a conviction against a defendant after he has been acquitted of criminal or quasi-criminal charges. Widmaier, supra, 157 N.J. at 492, 724 A.2d 241. This constitutional prohibition "assures that the State with its great resources will not be permitted to harass and oppress the individual by multiple prosecution or punishment for the same offense." State v. Currie, 41 N.J. 531, 536, 197 A.2d 678 (1964); see also United States v. Scott, 437 U.S. 82, 87, 98 S.Ct. 2187, 2192, 57 L.Ed.2d 65, 71-72 (1978).
We can remain faithful to double jeopardy principles and still avoid the inequitable prospect of giving defendant the opportunity to obtain, in effect, a windfall of two separate and logically-incompatible acquittalsone based on an insanity defense and the other based on a self-defense claim. In lieu of such a windfall, we will require defendant to choose to relinquish his present insanity-based disposition as a condition of obtaining a trial on the merits and presenting his contentions of self-defense. Requiring defendant to make such an election does not violate double jeopardy principles.
Our law recognizes that the defense of double jeopardy may be waived. State v. Allah, 170 N.J. 269, 282, 787 A.2d 887 (2002). The defense must be raised by motion before trial and the failure to do so constitutes a waiver. Ibid.; see also R. 3:10-2(c). Moreover, the defense of double jeopardy is not available to a defendant who, by his own initiative, causes his previous plea or conviction to be set aside. See In re Smigelski, 30 N.J. 513, 525, 154 A.2d 1 (1959).
The United States Supreme Court has explained that "to require a criminal defendant to stand trial again after he has successfully invoked a statutory right of appeal to upset his first conviction is not an act of governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect." Scott, supra, 437 U.S. at 91, 98 S.Ct. at 2194, 57 L.Ed.2d at 74. The Court firmly rejected the notion that "the Double Jeopardy Clause prohibited any new trial after the setting aside of a judgment of conviction against the defendant or that it `guarantees to him the right of being hung, to protect him from the danger of a second *1169 trial.'" Ibid. (quoting United States v. Keen, 26 F.Cas. 686, 690 (C.C.Ind.1839)).
Defendant has provided us with no legal justification for obtaining a new trial on the merits, while retaining his existing insanity-based disposition if he is unsuccessful in that trial. Instead, presuming that defendant is found competent on remand, we require him to make a fair choice: either retain his insanity-based acquittal and forego a plenary trial, or, alternatively, waive his present disposition and start, in essence, with a clean slate.
Our decision to impose such a fair choice upon defendant is consistent with principles expressed elsewhere. In fact, similar reasoning was applied in State v. Lewis, 188 S.W.3d 483, 485-86 (Mo.Ct.App.2006). There, the defendant, who had been diagnosed with schizoaffective disorder, proffered a defense of mental disease or defect that would negate the culpable mental state for charges of assault. However, in a bench trial, the State argued that he should be found not guilty by reason of insanity and, with no objection by the defendant, it submitted his medical records as evidence. Id. at 485. At the close of evidence, the defendant stated to the court that he sought only a judgment of guilty or not guilty, and that he did not rely on the insanity defense. Id. at 486. Nevertheless, the trial court found him not guilty by reason of insanity, and the defendant appealed. Ibid.
The Missouri Court of Appeals reversed. Ibid. The relevant statutes placed the burden of injecting the insanity issue and the burden of persuasion on the defendant. Id. at 487. It was an affirmative defense that must be initiated and proven by the defendant; nothing in the Missouri statutes allowed the defense to be raised by the State or the trial court. Id. at 487-88. The trial court in Lewis had no authority to acquit him based on that defense or to order his civil commitment. Id. at 488. According to the Missouri appeals court, the trial court improperly had "focused solely on the requirements of the affirmative defense of [not guilty by reason of insanity] and neither considered nor found whether the State had carried its burden of proof to show that the appellant had the requisite mens rea, as to the offenses charged[.]" Id. at 490.
Most importantly for our purposes, double jeopardy did not attach in Lewis, because the judgment there had declared the defendant not guilty by reason of insanity. Ibid. The appellate court consequently reversed the judgment and remanded the matter to the trial judge who heard all of the evidence, for his consideration of whether the State had carried its burden to prove the elements of the offenses, specifically the mens rea element to which the defendant had asserted the defense of mental disease or defect. Id. at 491.
Applying such double jeopardy principles here, we conclude that defendant is not precluded from seeking relief from his present disposition of a final judgment of not guilty by reason of insanity. However, as a fair condition of receiving the plenary trial on self-defense and other substantive issues that he desires on remand, defendant must voluntarily relinquish his insanity-based disposition in order to proceed with a trial on the merits. He is not entitled to both retain that judgment and obtain a new trial.

C.
Consequently, we now delineate the appropriate terms of a remand, in which defendant will be obligated, if he has the mental capability to do so, to make the choice we have prescribed. The remand process will entail several steps.
*1170 First, given the substantial lapse of time since the competency assessment of defendant was last made by the trial court in 2008, a renewed competency hearing must be performed before any new trial is begun in the trial court. The hearing should be preceded by one or more updated examinations of defendant by mental health experts.
Second, if defendant is found competent to stand trial on that renewed assessment, the court should then ascertain if he wishes to waive his double jeopardy rights.[26] If he does, his judgment of not guilty by reason of insanity should be vacated, and he should be granted a new trial at which he can raise any appropriate defense based on the evidence, including self-defense and, if he so chooses, insanity.[27] However, if defendant does not waive his double jeopardy rights, then the present insanity-based disposition should be left unaltered and no new trial shall be conducted.
The question then arises as to whether a trial on remand should be a unitary proceedingat which all issues, including any insanity defense, are presented and decidedor, alternatively, whether the proofs and the verdicts should be sequenced so as to reserve the insanity proofs and issues for a later phase of the same trial or for a second trial before another fact-finder. We have already canvassed the problems associated with each of these options. The State has urged that, if any trial is ordered on remand, it should be a unitary trial. Defendant argues that a unitary trial places him in an untenable position with inconsistent theories of defense, and that a sequenced or bifurcated process instead must be utilized.
We recognize that our State has a strong general preference for unitary criminal dispositions. As we observed in Haseen, supra, 191 N.J.Super. at 567, 468 A.2d 448, "[a] single trial is preferable because it conserves judicial resources and avoids the inherent unfairness of giving the accused two bites at the apple of acquittal." "`By trying all issues together, time and expense to both parties is conserved, and the single jury is given the entire picture.'" Ibid. (quoting State v. Levier, 226 Kan. 461, 601 P.2d 1116, 1119 (1979)). Moreover, Haseen recognized that "[t]he overwhelming majority of jurisdictions that have ruled on the subject have concluded that bifurcated trials are not required when [the] defendant creates the hard choice." Haseen, supra, 191 N.J.Super. at 567, 468 A.2d 448 (emphasis added).
Here, the defense of insanity was not elected by defendant in the first instance, but rather was interposed on his behalf against his express wishes. Defendant did not initially choose to present inconsistent theories to the court. He did not, as in Haseen, "create the hard choice." The situation has instead evolved, in essence, from a paternalistic endeavor to prevent *1171 him from waiving a defense that may not have been in his best interests to waive.[28] As we have noted, the involuntary interposition of that defense was not contested or briefed on this appeal.
The particular circumstances before us are also factually distinguishable from Haseen because that case involved a defendant's assertion of both an insanity defense and an alibi defense. Id. at 565, 468 A.2d 448. There was no self-defense claim in Haseen. Ibid. Unlike an alibi defense, a self-defense claim requires the trier of fact to evaluate the defendant's state of mind at the time of the incident, and the reasonableness of his response to a perceived attack. Consequently, Haseen did not have to address the difficulties of coupling a state of mind inquiry for self-defense purposes with a parallel inquiry of mindset for insanity purposes. The potential for prejudice to the defendant from a unitary trial is more palpable in the self-defense context.
In other special circumstances, our courts have departed from the unitary trial model in order to prevent undue prejudice to a defendant. For example, in State v. Ragland, 105 N.J. 189, 193-95, 519 A.2d 1361 (1986), the Supreme Court held that when a defendant is charged simultaneously with unlawful possession of a weapon and illegal possession of a weapon by a convicted felon, the possession-by-a-felon offense must be tried in a second phase before the same jury, in order to limit prejudice to the defendant. At the second phase of the trial, the jury must be carefully instructed "to consider anew the evidence previously admitted but to disregard. . . completely its prior verdict." Id. at 195, 519 A.2d 1361. The Court recognized that such a two-step process was wasteful, but that loss in efficiency was justified in order to protect the defendant's right to a fair trial. Ibid. On the other hand, sequencing the trial in two phases before the same jury avoids the need to empanel a new jury and "the waste of everyone's time involved in re-introducing evidence that has already been admitted." Ibid.
Similarly, in State v. Chenique-Puey, 145 N.J. 334, 678 A.2d 694 (1996), the Court found it unfair to conduct a unitary trial where a defendant is charged with both terroristic threats and with contempt of a domestic violence restraining order. The Court recognized that a jury at such a unitary trial, in considering the terroristic threat charges, might improperly interpret the existence of the prior restraining order as a "judicial imprimatur on the victim's testimony." Id. at 343, 678 A.2d 694. Consequently, the Court directed that, in future cases, the courts try the charges on the underlying present offense first and the contempt charges immediately thereafter, before the same jury. Ibid. Again, the Court recognized the inconvenience resulting from such sequential trials, but determined that such inconvenience was outweighed by the promotion of the defendant's right to a fair trial. Ibid.
Applying similar logic here, we conclude that a trial on remand should be conducted in two phases before the same jury.[29] First, there shall be a trial on the merits, including defendant's contentions of self-defense. Second, if necessary, a second trial before the same jury will proceed on any asserted insanity defense. Because this sequencing is designed to protect, most of all, fairness to the accused, defendant may elect to waive such a sequenced *1172 trial if he believes it is tactically in his best interests to do so. The jury in the second trial should also be issued appropriate instructions stressing the need to consider the evidence anew and not be influenced in the insanity trial by the positions that the State and defendant took in the first trial. Although we appreciate that such an instruction may be difficult to fashion and may not preclude improper spillover effects from the first trial, we believe such a procedure is preferable to a trial on insanity before a newly-impaneled jury. If, however, our approach in this case is deemed unwise, the Supreme Court and the Legislature are, of course, free to develop and require other alternatives.
We reject the State's contention that defendant's waiver of a jury in the insanity proceedings represented a plenary waiver of his right to a jury on his self-defense claims, or any other proceedings on remand, in the event of an appellate reversal. See State v. Di Frisco, 118 N.J. 253, 283, 571 A.2d 914 (1990) (noting that neither party is bound by a prior jury waiver after an appellate remand); see also State v. Campbell, 414 N.J.Super. 292, 998 A.2d 500 (App.Div.2010).
Furthermore, we should clarify that if defendant provides a waiver and the present judgment is accordingly vacated, the State is free to contest defendant's insanity if the insanity issue is retried. The State would not be estopped from abiding by its earlier position at the first trial agreeing that defendant was insane. This is because, by virtue of defendant's waiver, the court's original decision relying on the State's position would be vacated.[30] We detect no "miscarriage of justice" in mutually allowing both the State and defendant to conduct a potential retrial on the insanity issues unfettered by whatever positions they had taken in the past. See Jenkins, supra, 178 N.J. at 359, 840 A.2d 242 (quoting Kimball, supra, 334 N.J.Super. at 608, 760 A.2d 794 (noting that courts invoke judicial estoppel only "`when a party's inconsistent behavior will otherwise result in a miscarriage of justice'").

IV.
For the reasons we have set forth, the matter is remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] The residence is variously described in the record as both a "row house" and an "apartment."
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] We intimate no view on whether the uncle's prior criminal convictions or past drug use would be admissible, under N.J.R.E. 404(b) or otherwise, at a trial on the merits.
[4] We have not been provided with a transcript of those initial proceedings, although they are alluded to in later correspondence from the court. The absence of the earlier transcript is inconsequential to our review, since the second judge ultimately found defendant competent to stand trial, albeit incompetent to waive an insanity defense.
[5] In his testimony, Dr. Harris explained the difference between "psychotic" and "floridly psychotic." According to Dr. Harris, the term "psychotic" means that an individual was "having experiences that most of us don't have, so they may be suspicious of people around them." For example, the person may think their food is being poisoned, that they are being followed, or they may hear voices. By comparison, Dr. Harris explained that when patients are "floridly psychotic," "the psychosis becomes prominent, where it impacts on their behavior and they're no longer able to contain that behavior so it clearly becomes visible to other people[.]"
[6] Pursuant to N.J.S.A. 2C:4-8b(3), that commitment period is capped by the maximum ordinary term of imprisonment that could have been imposed under the indictment, which, in this case, is a term of life in prison. See N.J.S.A. 2C:11-3b(1).
[7] Defendant's notice of appeal identifies only the final judgment of conviction dated June 3, 2009, and does not identify any of the trial court's interim orders that preceded it, including the October 20, 2008 bifurcation order. Even so, we construe the appeal to encompass the October 20, 2008 order, given the repeated statements by defendant's trial counsel explicitly preserving his right to appeal the bifurcation order, and his unsuccessful motion for interlocutory appellate relief. Also, since it is not challenged by the State, we presume that defendant was sufficiently competent to have authorized this appeal and the relief that it seeks.
[8] Notably, defendant has not raised, in his appellate briefs or at oral argument, any challenge to the trial court's determination that he was competent to stand trial. Nor has defendant contested the trial court's separate ruling that, notwithstanding his competency to be tried, he lacked sufficient mental capacity to waive an insanity defense. Although we discern significant conceptual difficulties in reconciling these two rulings, we need not address them here, given the particularized focus of defendant's appeal.
[9] The public defender took no position on competency and simply asked us to reach a "just determination" on that issue. Ibid.
[10] Again, we emphasize that defendant has not appealed the application of this facet of Khan in this case and the trial court's dual findings of his competency to stand trial but his inability to waive an insanity defense.
[11] See State v. Haseen, 191 N.J.Super. 564, 566, 468 A.2d 448 (App.Div.1983) (noting that Khan did not require a bifurcated trial when a defendant voluntarily chose to rely on the inconsistent defenses of insanity and alibi); State v. Johnston, 257 N.J.Super. 178, 191-96, 608 A.2d 364 (App.Div.), certif. denied, 130 N.J. 596, 617 A.2d 1219 (1992) (finding that the trial court did not abuse its discretion when, over the objection of a defendant who asserted a defense of insanity/diminished capacity, the trial court also instructed the jury on self-defense, because that defense was warranted by the proofs and, under the circumstances, the defenses were "not totally inconsistent"); State v. Cecil, 260 N.J.Super. 475, 489, 616 A.2d 1336 (App.Div. 1992), certif. denied, 133 N.J. 431, 627 A.2d 1138 (1993) (detecting no error where the trial court allowed a defendant with a history of bizarre behavior to forego an insanity defense, where the defendant "was able to make a knowing, intelligent, and voluntary waiver of his right to assert the defense"); State v. Marut, 361 N.J.Super. 431, 433-43, 825 A.2d 1180 (App.Div.2003) (noting that neither the procedures established by Khan, nor the Code provisions relating to competency and the insanity defense, authorized the trial court's appointment of amicus counsel to investigate a defendant's capacity to make a knowing, intelligent, and voluntary waiver of the insanity defense and to present arguments in favor of that defense).
[12] The trial court in Ramseur, supra, had instructed the jury on insanity, over the objection of the defendant, who had waived that defense. Id. at 270 n. 62, 524 A.2d 188. Although the defendant had not contested the propriety of that jury instruction on appeal, the Court nevertheless cautioned trial courts to use "the greatest care" when considering whether to instruct the jury about a defense that had been waived. Ibid. In doing so, the Court recognized that "there is considerable force behind the position that a competent defendant may reject the defense of insanity for any number of reasons[.]" Ibid. (citing Khan, supra, 175 N.J.Super. at 81, 417 A.2d 585).
[13] Khan initially was argued on January 7, 1980, just four months after the Code became effective; it was reargued on June 2, 1980, and decided on July 15, 1980. Khan, supra, 175 N.J.Super. at 72, 417 A.2d 585.
[14] M'Naghten's Case, 8 Eng. Rep. 718 (H.L. 1843).
[15] The reason for adopting that sequence in the District of Columbia was because the pivotal question to be resolved was "not the degree of [defendant's] culpability (and hence the severity of the possible punishment), but rather, given the government's satisfactory showing of a complete offense, whether the wrongdoer should be excused and the punishment set aside in favor of possible therapeutic confinement." Bethea, supra, 365 A.2d at 94-95.
[16] See Kathryn S. Berthot, Comment, Bifurcation in Insanity Trials: A Change in Maryland's Criminal Procedure, 48 Md. L. Rev. 1045 (1989) (noting that "[t]he practice of bifurcating criminal trials into separate hearings on the questions of guilt and insanity invariably elicits considerable controversy").
[17] For example, in Minnesota, when a defendant intends to rely on a defense of mental illness or deficiency together with a defense of not guilty, "the court must separate the two defenses" and the defense of not guilty "must be heard and determined first [and] the defense of mental illness or deficiency must be heard and determined second." See Minn. R.Crim. Proc. 20.02, subd. 7 (2010). In Wisconsin, when a defendant combines a plea of not guilty with a plea of not guilty by mental disease or defect, the issues are separated "with a sequential order of proof in a continuous trial" and the not guilty plea determined is first, followed by the defense of not guilty by reason of mental disease or defect. Wis. Stat. § 971.165(1)(a) (2011).
[18] For instance, Maine statutes allow the defendant to elect to proceed in either of two stages, where the issue of guilt is tried first, or, alternatively, with a unitary trial. Me.Rev. Stat. tit. 17-A, § 40 (2011). In Maryland, court rules allow a motion for bifurcation by either the defendant or the State, if the defendant has entered pleas of both not guilty and not guilty by reason of insanity and he or she has elected a jury trial. Md. R. 4-314(a) (2011). The court in Maryland must grant the defendant's motion absent a finding of a compelling reason to deny it, but it may grant the State's motion only if it finds a compelling reason for bifurcation and that the defendant will not be substantially prejudiced. Id. at -314(a)(3).
[19] See, e.g., Daniels v. State, 538 A.2d 1104, 1110 n. 7 (Del. 1988); State v. Jenkins, 412 N.W.2d 174, 175-76 (Iowa 1987); Commonwealth v. Siegfriedt, 402 Mass, 424, 522 N.E.2d 970, 975 (1988); State v. Mancuso, 321 N.C. 464, 470, 364 S.E.2d 359, 363-64 (1988).
[20] See, e.g., State v. Devine, 372 N.W.2d 132, 137-38 (S.D.1985) (noting that a failure to bifurcate where the defendant had made incriminating statements during a psychiatric examination was presumed to be prejudicial, unless the evidence of guilt was so strong as to negate any actual prejudice from a unitary trial); State v. Boyd, 167 W.Va. 385, 280 S.E.2d 669, 675-76 (1981) (applying a two-part inquiry examining whether both general defense and insanity defense are substantial; if they are, the court then must determine the likelihood of prejudice if both are presented at a unitary trial).
[21] But see Martin Sabelli & Stacey Leyton, Train Wrecks and Freeway Crashes: An Argument For Fairness and Against Self-Representation in the Criminal Justice System, 91 J.Crim. L. & Criminology 161, 217, 225-26 (2000) (advocating bifurcated trials "in which a defendant could first present [his] chosen defense and then defense counsel could present a defense based on mental illness," even if the defendant's desire to present a merits-based defense "is not supported by substantial evidence").
[22] For example, the Florida Supreme Court found a denial of due process in a statute that provided for bifurcated proceedings, but precluded the introduction of any evidence of insanity in the initial proceedings that determined guilt or innocence. State ex rel. Boyd v. Green, 355 So.2d 789, 792-93 (Fla.1978). The court reasoned that the presumption of sanity afforded by the statute improperly relieved the State of its burden to prove every element of the crime, because intent was an element of most crimes. Ibid.; accord State v. Shaw, 106 Ariz. 103, 471 P.2d 715, 725 (1970), cert. denied, 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971); Wisehart v. State, 693 N.E.2d 23, 38-40 (Ind.1998), cert. denied, 526 U.S. 1040, 119 S.Ct. 1338, 143 L.Ed.2d 502 (1999); Sanchez v. State, 567 P.2d 270, 273-80 (Wyo.1977).
[23] By comparison, we note that in Khan, the defendant was represented not only by the Office of the Public Defender but also by co-counsel from the State's Division of Mental Health Advocacy, and by court-appointed counsel. Khan, supra, 175 N.J. Super. at 74-75, 417 A.2d 585.
[24] "Proponents view bifurcation as an important procedural device to prevent evidence on the issue of insanity from prejudicing the jury during the guilt-innocence determination." Neslund, supra, 31 Emory L.J. at 441. On the other hand, critics of bifurcation argue that "it is logically impossible to decide the issue of guilt without concurrently deciding the issue of sanity[,]" particularly "[s]ince intent is an element of most crimes[.]" Ibid.
[25] We suggest that a Committee review of bifurcation be accompanied by a review of another important aspect of Khan not being pursued on this appeal: whether and when the court should, sua sponte, interpose an insanity defense upon a defendant who does not wish to assert it.
[26] In making that assessment, the trial court will not be bound, as "the law of the case" or otherwise, by the trial court's prior finding that defendant was not capable of waiving the interposition of an insanity defense. Nor will the trial court be bound by its prior finding that defendant was able to knowingly and intelligently waive a jury at the prior insanity trial. In other words, defendant's mental status must be evaluated anew, on fresh evidence.
[27] We need not address, despite the parties' invitation that we do so, the contours of what evidence respecting defendant's mental condition can or cannot be admitted as relevant evidence at a plenary trial. We envision that hearings on admissibility under N.J.R.E. 104 may be appropriate to resolve those questions.
[28] See generally Anne C. Singer, The Imposition of the Insanity Defense on an Unwilling Defendant, 41 Ohio St. L.J. 637 (1980).
[29] We note that the judge who previously presided over the insanity trial has now retired.
[30] See State v. Jenkins, 178 N.J. 347, 358-59, 840 A.2d 242 (2004) (noting that the extraordinary remedy of judicial estoppel should not be applied where the litigant's position was not ultimately adopted); see also State v. Heisler, N.J.Super. ___, ___, ____ A.3d ____, No. A-6281-08 (App.Div. May 17, 2011), slip op. at 15-16, 2011 WL 1885670 (declining to apply judicial estoppel where the prosecution's earlier position was not successfully espoused); Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J.Super. 596, 608, 760 A.2d 794 (App.Div.2000), certif. denied, 167 N.J. 88, 769 A.2d 1051 (2001).